CIVIL RIGHTS COMMISSION v CHRYSLER CORPORATION

1. CIVIL RIGHTS—EMPLOYMENT—CIVIL RIGHTS COMMISSION—WRITTEN COMPLAINT—STATUTES.

   A statute which provides that an employee who considers himself aggrieved by an unlawful employment practice as defined in the Fair Employment Practices Act may file a complaint with the Civil Rights Commission also requires that such complaint be a verified complaint in writing (MCLA 423.307[b]).

2. CIVIL RIGHTS—CIVIL RIGHTS COMMISSION—UNFAIR LABOR PRACTICES—JURISDICTION—CONSTITUTIONAL LAW—STATUTES.

   The exercise of the jurisdiction of the Civil Rights Commission, and not the jurisdiction itself, is limited by statute to situations wherein a written complaint has been filed in cases of alleged unfair labor practices under the Fair Employment Practices Act; the statute is a legitimate legislative definition of the manner in which the commission functions as intended by the framers of the constitution when they created the commission and mandated that it carry out its duties "in a manner which may be prescribed by law" (Const 1963, art 5, § 29; MCLA 423.307[b]).

3. CIVIL RIGHTS—DISCRIMINATION—EMPLOYMENT—CIVIL RIGHTS COMMISSION—STATUTES—WRITTEN COMPLAINT—SUBSTANTIAL COMPLIANCE.

   The statutory requirement of a verified written complaint was substantially complied with by a complainant who alleged to the Civil Rights Commission that he was the victim of discrimination and, thus, of an unfair labor practice under the Fair Employment Practices Act, where he had filed a prior verified complaint in writing regarding a suspension which occurred before his discharge, the commission's activity pursuant to that complaint encompasses events reasonably related to and growing out of the initial complaint, and the employer has actual knowledge of the substance of the proceedings (MCLA 423.307[b]).

REFERENCE FOR POINTS IN HEADNOTES
[1–4] 15 Am Jur 2d, Civil Rights § 56 *et seq.*

4. Civil Rights—Labor Relations—Collective-Bargaining Agree-
ment—Grievance Procedure—Civil Rights Commission—Dis-
crimination.

An employee who has been discharged from employment and who
has pursued a grievance under a collective bargaining agree-
ment alleging unjust discharge, is not thereby precluded from
filing a complaint with the Civil Rights Commission wherein he
alleges discriminatory employment practices; both the contrac-
tual and the statutory rights have legally independent origins
and are equally available to an aggrieved employee.

Appeal from Ingham, Jack W. Warren, J. Sub-
mitted June 4, 1975, at Detroit. (Docket No.
18597.) Decided September 22, 1975.

The Civil Rights Commission, acting on the
complaint of Elmer Boyd, alleging racial discrimi-
nation in his discharge from employment, issued
an order against Chrysler Corporation, Mack Ave-
nue Stamping Plant, for reinstatement. Chrysler
appealed to the circuit court, which granted sum-
mary judgment for Chrysler. The Civil Rights
Commission appeals by leave granted. Reversed
and remanded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Michael A.
Lockman* and *Kavin A. Verdon,* Assistants Attor-
ney General, for the Civil Rights Commission.

*A. William Rolf* and *Keith A. Jenkins,* for
Chrysler Corporation.

Before: Danhof, P. J., and R. B. Burns and
R. M. Maher, JJ.

R. B. Burns, J. We are called upon in this case
to consider two independent questions of first im-
pression in this jurisdiction. First, we must con-
strue the meaning of MCLA 423.307(b); MSA

17.458(7)(b), concerning a requirement of a written complaint as a condition precedent to the initiation of proceedings before the Michigan Civil Rights Commission (hereinafter "CRC"), plaintiff-appellant in this action. Second, we must consider the impact of a contrary arbitration decision upon a discharged employee's alternative access to relief via the CRC. Our analysis requires us to reverse the Ingham County Circuit Court's grant of defendant Chrysler Corporation's (hereinafter. "Chrysler") motion for a summary judgment.

Elmer Boyd, a black, was suspended from his job at Chrysler on March 25, 1968. Two days later, March 27, Mr. Boyd filed a complaint with the CRC including an allegation of racial discrimination in employment. On April 25, 1968, Chrysler discharged Mr. Boyd for failure to exert a normal effort to do his job. Three days later, April 28, Mr. Boyd filed a union grievance charging "unjust discharge". The grievance progressed through prescribed steps to binding arbitration. On December 26, 1968, the arbitrator concluded that Mr. Boyd had been properly discharged for deliberately failing to exert a normal effort to do his job.

On October 20, 1970, the CRC issued a "Charge" or formal complaint, on behalf of Mr. Boyd against Chrysler alleging that race was a factor in his suspension and discharge. The CRC held a hearing before a hearing referee on January 18, February 8, 9, 11, and 12, 1971. On July 29, 1971, the referee issued his report containing the recommendation that Mr. Boyd's complaint be dismissed. On January 17, 1972, the CRC issued findings of fact and a final order contravening the referee and concluding that race had been a factor in the discharge of Mr. Boyd.

On February 22, 1972, Chrysler filed a petition

for review and claim of appeal from the January 17 order in the Ingham County Circuit Court. Before trial Chrysler moved for a summary judgment on the ground that Mr. Boyd had elected an arbitration remedy for his discharge to the preclusion of CRC proceedings. After argument, the court, at its own initiative, wrote the CRC requesting the complaint of Mr. Boyd relating to his April 25, 1968 discharge. In response the CRC indicated that no request had been made of Mr. Boyd to file a second complaint, that the CRC felt that no such complaint was necessary, that its conciliation efforts and hearings had begun subsequent to the discharge and focused thereupon, and that the CRC did not require a new complaint where the subject matter of a cause related to an existing complaint. Chrysler responded by stating that it would not raise as a defense the failure to have the discharge specifically covered by a complaint.

On May 23, 1973, without further argument, the court granted Chrysler's motion for summary judgment setting aside the CRC's order for two reasons: (1) The CRC acted without authority because Mr. Boyd had not filed a written complaint setting forth the particulars of his discharge; and (2) Mr. Boyd, by pursuing his contract grievance procedure to a determination, caused a binding decision to be made preclusive of CRC action to the contrary.

We first consider the question of the nature of a complaint necessary to trigger the involvement of the CRC, and note at the outset what is obvious: the commission is a constitutionally-created entity deriving its powers directly from the people. The full text of the relevant constitutional provisions reads as follows:

Article 1, § 2.

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."

Article 5, § 29.

"There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination. The legislature shall provide an annual appropriation for the effective operation of the commission.

"The commission shall have power, in accordance with the provisions of this constitution and of general laws governing administrative agencies, to promulgate rules and regulations for its own procedures, to hold hearings, administer oaths, through court authorization to require the attendance of witnesses and the submission of records, to take testimony, and to issue appropriate orders. The commission shall have other powers provided by law to carry out its purposes. Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state.

"Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court having jurisdiction provided by law."

It is necessary to understand the antecedents of

the CRC in order to properly conceive the issue considered herein. The year 1955 saw enactment of the Fair Employment Practices Act, MCLA 423.301 *et seq.;* MSA 17.458(1) *et seq.,* defining a civil right to employment without discrimination and creating the Fair Employment Practices Commission to administer the act. The new constitution became effective on January 1, 1964, and, in anticipation, the Legislature enacted MCLA 37.1 *et seq.;* MSA 3.548(1) *et seq.,* to take effect on the same day. This statute amended the 1955 law by substituting all references to the former FEPC with appropriate references to the new CRC, but leaving intact those sections of the 1955 law defining an unfair employment practice and the procedures available to persons claiming to be aggrieved by such practice. Of specific import is the language of MCLA 37.4; MSA 3.548(4), that "a complaint alleging an unlawful discriminatory practice is subject to the same procedure as a complaint * * * under * * * sections 423.301 to 423.311". The test of the relevant portion, MCLA 423.307(b); MSA 17.458(7)(b) reads as follows:

"Any individual claiming to be aggrieved by an alleged unlawful employment practice may, by himself or his agent, make, sign and file with the board, within 90 days after the alleged act of discrimination, a verified complaint in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful employment practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the board. Any employer whose employees, or some of whom, refuse or threaten to refuse to cooperate with the provisions of this act, may file with the board a verified complaint asking for assistance by conciliation or other remedial action."

The critical language in the 1963 Constitution, article 5, § 29, is that it shall be the CRC's duty "in a manner which may be prescribed by law" to investigate alleged discrimination and to secure the equal protection of the law. Focusing on the constitutional origin of the CRC, we need determine if MCLA 423.307 and MCLA 37.4 represent a permissible exercise of the Legislature's restricted authority to prescribe "the manner" of the CRC's operation, or if these statutes impose a possibly unconstitutional jurisdictional limitation upon the commission. Preliminarily, a determination of the apparent intent of the constitutional framers as to any legislative authority or influence over the CRC is mandatory.[1]

The extensive and impassioned convention debate over the proposals that eventually merged into article 5, § 29 was almost exclusively concerned with the potential role of the Legislature vis-a-vis the projected commission. Proponents of the commission repeatedly observed that it "has been bottled up in committee" for "10 long years, in this state legislature". 2 Official Record, Constitutional Convention 1961, p 2004 (delegate Hodges) (hereinafter "Record"). Others worried lest "our legislature disappear * * * completely beneath the waves". 2 Record 1997 (delegate Heideman). As expressly recognized: "It's a question of how much you want to require the legislature to do, or to require it by the constitution." 2 Record 1990 (delegate Martin).

The efforts of the proponents united around an amendment presented by delegate Austin *et al.* The ultimate goal was to provide a "self executing" commission, such that "whether the legisla-

---

[1] For an excellent survey, *see* Cramton, *The Powers of the Michigan Civil Rights Commission,* 63 Mich L Rev 5 (1965).

ture acts or not we will have a civil rights commis-
sion". 2 Record 1983 (delegate Austin). Opposition
oriented to "not leaving that completely free from
the legislature". 2 Record 1988 (delegate Staiger).
After long debate and a series of amendments by
the Republican majority, the result was summa-
rized by delegate Nord as follows:

"We have to recognize that we have given the legisla-
ture several vetoes already * * * . If there are no funds
coming from the legislature, there is not going to be
much function of the commission. Secondly, we provide
the legislature may provide for methods of implement-
ing these duties. They may provide that. Thirdly, we
now have provided that the legislature may, if they
wish, change the powers. There are 3 legislative checks
already." 2 Record 1998.

Delegate Martin, a proponent and chairman of the
committee that advanced the CRC proposal, ob-
served that "[t]his is the barest kind of bones of
authority to operate. It does not specify how, and
it would undoubtedly fall to the legislature to
implement this with legislation, filling in gaps as
to what needed to be done." 2 Record 1990. Thus,
it is manifest that the framers intended legislative
participation sufficient to "make the activities of
this administrative agency subject to the same
limitations as other administrative agencies". 2
Record 1994 (delegate Martin).

We must determine if MCLA 423.307(b); MSA
17.458(7)(b) is such legislative participation as is
permissible by prescribing the "manner" but not
proscribing the ultimate power of the CRC to act.
In this regard we must construe the regrettably
imprecise language of the statute, particularly the
provision that an aggrieved individual "may"
make a verified complaint in writing.

Appellant contends that the use of the "permissive word 'may' * * * is directory rather than mandatory", but also notes that judicial construction of statutory terminology has evolved such that "[c]ourts have not infrequently construed the word 'may' to mean 'shall' and vice versa". *Smith v School District No 6, Fractional, Amber Township,* 241 Mich 366, 368–369; 217 NW 15 (1928). We believe that the overall form of MCLA 423.307 evidences the legislative intent to make a written complaint mandatory.

It is obvious that the intent of MCLA 423.307 is obscured by some inconsistent language. The "verified complaint in writing" of subsection (b) becomes a "charge" made "by any individual" in subsection (d). In its brief, appellant concludes:

"Obviously, had the Legislature intended the written, verified complaint to constitute the exclusive method for commencing proceedings before the Commission, it would have consistently used the term 'complaint.' "

This conclusion is not convincing. The continuing headnote allusion "Same" in subsections (c) and (d) makes it more likely that the term "charge" in subsection (d) is a specific reference to the "verified complaint in writing" denoted in subsection (b). Further, it is unlikely that the Legislature would have prescribed with great specificity eight subsections of procedure derivative from subsection (b) had it intended anything less than a "verified complaint in writing". We interpret the word "may" to here mean "shall": more specifically, that if an individual considers himself aggrieved by an unlawful employment practice he *may* decide to bring a complaint; and, if he so decides, he *shall* bring a verified complaint in writing.

Appellant maintains in the alternative that, if

MCLA 423.307(b) is construed as mandatory, it is unconstitutional as a legislative abrogation of the constitutionally created jurisdiction of the CRC. Again, we are not convinced. Instructive is the language of Title VII creating the Equal Employment Opportunity Commission, the Federal agency of parallel function to the CRC, indicating indisputably that a written complaint before that body is absolutely mandatory: "Charges shall be in writing under oath or affirmation * * * ." 42 USC 2000e-5. Recalling the specific language of article 5, § 29, "in accordance with * * * general laws governing administrative agencies", it is concluded that subsection (b) as construed is typical and not unconstitutionally onerous as a legislative block on the jurisdiction of CRC to act. Appellant's contention is misfocused; subsection (b) does not limit the CRC's jurisdiction, but limits the *exercise* of that jurisdiction to situations where a written complaint has been filed. As such it represents a legitimate legislative definition of "the manner" of the CRC's functioning. Borrowing a colloquial reference, we think it apparent that the framers intended a "watch dog" rather than a "bird dog" agency. The concern was that the commission not "freewheel". 2 Record 1992 (delegate Martin).

Most compelling to us is the opinion of the Michigan Supreme Court in *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971). In referring to the 90-day limitation in MCLA 423.307(b), the Court considered themselves "constrained to agree with defendant that plaintiff's *statutory* remedy is barred since the applicable limitational period has run". *Pompey, supra,* p 550, and pp 550–551 n 11. The Court's adherence to this statutory rule is equivalent in effect to a determination of constitutionality.

It may be agreed that lay-initiated administrative pleadings should be liberally viewed, and that legislative intent is not to be "hampered by a combination of a strict construction of the statute and a battle with semantics". *Culpepper v Reynolds Metals Co,* 421 F2d 888, 891 (CA 5, 1970). Yet we do not consider the requirement of subsection (b) to be a "procedural nicety" or a "mere legal technicality". We consider it a reasonable expression of a legislative prerogative.

Our procedural inquiry is not ended by concluding that a written complaint is mandatory and that the statute as construed is constitutional. It remains to be determined if the requirement of subsection (b) was adequately complied with in this instance.

Mr. Boyd filed a written complaint with the CRC charging racial discrimination. This filing was made immediately subsequent to his suspension, and less than one month prior to his discharge. The parties are agreed that the CRC's investigations, conciliation efforts and hearings all began after Mr. Boyd's discharge and centered thereupon. Mr. Boyd relied upon this continuing CRC processing of his original complaint, never being asked by the CRC to file a second complaint. Chrysler has repeatedly asserted that it would not demand a requirement of a subsequent complaint, ostensibly to avoid "further formalisms" that "would merely have resulted in the filing of an additional complaint". Chrysler also admits to having actual notice throughout these proceedings.

We are not disposed to attribute undue weight to Chrysler's gracious concessions, and would not accept a purported waiver of any and all requirement for some form of prior "verified complaint in writing". However, in perceiving the requirement

to be essentially one of procedural due process (and thus "waivable" in theory), we believe that these specific facts succeed in triggering the processes of the CRC. In *NLRB v Fant Milling Co,* 360 US 301; 79 S Ct 1179; 3 L Ed 2d 1243 (1959), the United States Supreme Court construed a complaint provision very similar to MCLA 423.307(b) to allow the agency to investigate events occurring subsequent to the filing of the "charge" or initial allegation of unlawful conduct. Regarding Title VII, both *Sanchez v Standard Brands, Inc,* 431 F2d 455 (CA 5, 1970), and *Tipler v E I duPont de-Nemours & Co,* 443 F2d 125 (CA 6, 1971), adopted the rule of *King v Georgia Power Co,* 295 F Supp 943, 947 (ND Ga, 1968), that judicial complaints filed pursuant to Title VII "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission". These cases are suggestive of the expansive language of MCLA 423.307(h) that the CRC may address "any unfair employment practice" revealed during an authorized investigation, presumably including practices unknown to complainant. Additionally, in *Lisee v Secretary of State,* 388 Mich 32; 199 NW2d 188 (1972), the Michigan Supreme Court found plaintiff's failure to comply strictly with notice provisions of the Motor Vehicle Accident Claims Act to be nonfatal where the Secretary of State had actual notice of the claim and was not prejudiced in any way.

The thrust of these cases is persuasive. At least in situations where: (1) a complainant filed a prior "verified complaint in writing"; (2) the agency activity pursuant thereto encompasses events "reasonably related to and growing out of" the initial complaint; and (3) the respondent has actual

knowledge of the substance of these proceedings; then the mandatory requirement of MCLA 423.307(b) is satisfied through substantial compliance. The circuit court erred in granting Chrysler's motion for summary judgment on this ground.

We turn to the substantive issue of the effect of an arbitration decision, as to contractual rights under a collective bargaining agreement, upon the vindication of a state statutory civil right.

The general policy favoring arbitration has been clearly indicated by the United States Supreme Court:

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers of America v Enterprise Wheel & Car Corp,* 363 US 593, 596; 80 S Ct 1358, 1360; 4 L Ed 2d 1424 (1960).

The Court has further held that, as a matter of Federal labor law, an employee must at least attempt to exhaust the grievance and arbitration processes established under a collective bargaining agreement, *Republic Steel Corp v Maddox,* 379 US 650; 85 S Ct 614; 13 L Ed 2d 580 (1965), subject to an exception that the procedures not be tainted by union or arbitrator breaches of the same agreement. *Vaca v Sipes,* 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 (1967).

It seems apparent that the circuit court adopted in this case the rationale of *Dewey v Reynolds Metals Co,* 429 F2d 324 (CA 6, 1970), offered as the basis of argument by respondent. *Dewey* held that the policy favoring arbitration requires dismissal

of an employment discrimination action under Title VII where the grievance has already been adjudicated finally by arbitration.

*Dewey* has been overturned by the Supreme Court's opinion in *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974). The Court held that, in an action brought under Title VII, the paramount national policy condemning discriminatory employment practices overbalances the policy favoring arbitral finality:

"We think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII. The federal court should consider the employee's claim *de novo.* The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander v Gardner-Denver Co, supra,* 415 US 36, 59–60.

*Alexander* declined to apply such doctrines as election of remedies, res judicata, and collateral estoppel, rejected the thought that complainant had "two strings to his bow", and found that "[b]oth rights [contractual and statutory] have legally independent origins and are equally available to the aggrieved employee". *Alexander, supra,* pp 52, 54.

This Federal policy against discriminatory employment practices is no stronger than the parallel policy of our state as expressed in Const 1963, art I, § 2 and MCLA 423.301; MSA 17.458(1). And although the CRC is an administrative agency, it is charged by the express language of Const 1963, art 5, § 29 to "secure" the "civil rights guaranteed

by law and by this constitution". The rationale of *Alexander* applies.

Further, in *Pompey v General Motors Corp,* 385 Mich 537, 551; 189 NW2d 243, 250 (1971), the Michigan Supreme Court held that "plaintiff may avail himself of a cumulative judicial remedy in vindication of this specific civil right", freedom from discrimination in private employment. This provision for cumulative and overlapping remedies in the most important context of civil rights is an appropriate anticipation of the spirit of *Alexander.* See also *Michigan Civil Rights Comm v Clark,* 390 Mich 717; 212 NW2d 912 (1973).

Mr. Boyd's grievance claimed only "unjust discharge", with no reference to the racial discrimination that he alleged before the CRC. Chrysler contends that this most general grievance necessarily called the entire "common law" of the shop into issue, including a specific provision in the collective bargaining agreement prohibiting racial discrimination, and that the arbitrator thereby automatically considered and dismissed racial discrimination in concluding that Mr. Boyd was a malingerer. There is no indication in the arbitrator's opinion that he gave any consideration to the possibility of racial discrimination, and we do not believe that he did. In *Alexander,* the grievant alleged racial discrimination in both his grievance procedure and his subsequent agency and court proceedings. Mr. Boyd's failure or decision not to grieve racial discrimination makes these facts even stronger for a proposition that no arbitral decision ever existed to operate as a bar to agency proceedings.

The decision of the circuit court as to arbitral finality is in error.

The cause is reversed and remanded to the trial court for a decision on the merits. No costs, a public question.