## CIVIL RIGHTS COMMISSION v CHRYSLER CORPORATION

1. APPEAL AND ERROR—CIVIL RIGHTS COMMISSION—CIRCUIT COURT—SCOPE OF REVIEW—STATUTES.

   Review in the Court of Appeals of a decision of the Civil Rights Commission which has been appealed to the circuit court is a review of the circuit court's decision, not a review of the decision of the Civil Rights Commission (MCLA 37.2606[3]; MSA 3.548[606] [3]).

2. CIVIL RIGHTS—DISCRIMINATION IN EMPLOYMENT—RACIAL DISCRIMINATION.

   The crux of a civil rights suit wherein it is alleged that an employee was discharged because of race is that similarly situated people have been treated differently because of their race.

3. CIVIL RIGHTS—DISCRIMINATION IN EMPLOYMENT—RACIALLY MOTIVATED DISCHARGE—DISPARATE TREATMENT—CIVIL RIGHTS ACT—STATUTES.

   A plaintiff alleging that his discharge from employment was racially motivated and that he was given "disparate treatment", in order to make a prima facie showing of discrimination, must show that he was a member of the class entitled to protection under the Civil Rights Act and that, for the same or similar conduct, he was treated differently than one who was a member of a different race (MCLA 37.2101 *et seq.;* MSA 3.548[101] *et seq.*).

4. APPEAL AND ERROR—ADMINISTRATIVE LAW—CIVIL RIGHTS—CIRCUIT COURT—COURT OF APPEALS—CLEARLY ERRONEOUS.

   It is proper for a circuit court reviewing a decision of the Civil Rights Commission to make its decision on the basis of the record made before the administrative law judge; review by the Court of Appeals is to determine whether the circuit court's decision was clearly erroneous.

REFERENCES FOR POINTS IN HEADNOTES
[1] 2 Am Jur 2d, Administrative Law § 553 *et seq.*
[2, 3, 5–8] 15 Am Jur 2d, Civil Rights §§ 148, 149.
[4] 1 Am Jur 2d, Administrative Law § 170.

5. CIVIL RIGHTS—DISCRIMINATION IN EMPLOYMENT—RACIAL DISCRIMI-
   NATION—DISPARATE TREATMENT—PRIMA FACIE CASE—EVI-
   DENCE.

   There are two principles applicable, in a suit alleging a racially
   discriminatory discharge from employment, to determine
   whether a plaintiff has made a prima facie showing that he was
   given disparate treatment: (1) the prima facie showing of
   discrimination which the plaintiff is responsible for making is
   not merely presentation of enough evidence to avoid a directed
   verdict, as if it were a jury trial, but rather, presentation of
   enough evidence to entitle the plaintiff to a judgment if a
   nondiscriminatory reason for the discharge is not shown, and
   (2) all the evidence presented must be considered, there is no
   need to ignore opposing evidence to determine if the plaintiff
   has made a prima facie case because if the employer can refute
   a claim of disparate treatment, it should not bear the burden of
   proving a valid nondiscriminatory reason for the discharge.

6. COURTS—COURT OF APPEALS—FEDERAL PRECEDENT—CIVIL RIGHTS—
   DISCRIMINATION IN EMPLOYMENT—RACIAL DISCRIMINATION.

   It is appropriate for the Court of Appeals to rely on Federal
   decisions in making its decision in review of a case dealing with
   alleged racial discrimination in the discharge of a worker.

7. CIVIL RIGHTS—DISCRIMINATION IN EMPLOYMENT—DISPARATE TREAT-
   MENT—SIMILARLY SITUATED EMPLOYEES.

   A necessary part of determining whether similarly situated per-
   sons were treated differently in a claim of violation of civil
   rights is to determine whether, in fact, the persons were
   similarly situated.

8. CIVIL RIGHTS—DISCRIMINATION IN EMPLOYMENT—RACIAL DISCRIMI-
   NATION.

   An employer who is defending against a claim that an employee
   was discharged for racially discriminatory reasons and that the
   employee was given disparate treatment cannot be held liable
   for failure to train the employee to perform a particular task
   absent a showing that this failure constituted dissimilar treat-
   ment.

Appeal from Ingham, Jack W. Warren, J. Sub-
mitted June 9, 1977, at Lansing. (Docket No.
30916.) Decided December 27, 1977.

The Civil Rights Commission, acting on the

complaint of Elmer Boyd, alleging racial discrimination in his discharge from employment, issued an order against Chrysler Corporation, Mack Avenue Stamping Plant, for reinstatement. Chrysler appealed to the circuit court, which summarily held for Chrysler. The Civil Rights Commission appealed by leave granted. Reversed and remanded for a decision on the merits, 64 Mich App 393 (1975). After remand the circuit court reversed the order of the Civil Rights Commission. Plaintiff appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Michael A. Lockman* and *Joseph Cusmano,* Assistants Attorney General, for Michigan Civil Rights Commission.

*Philo, Cockrel, Spearman, Cooper, Rine, King and Atkinson,* for Elmer Boyd.

*A. William Rolf,* for Chrysler Corporation.

Before: DANHOF, C. J., and T. M. BURNS and A. E. KEYES,* JJ.

T. M. BURNS, J. In this case, the Civil Rights Commission and Elmer Boyd claim that Boyd was discharged from his employment at Chrysler Corporation, Mack Avenue Stamping Plant, because of his race. The procedural history of this case can be found in the report of a prior appeal in this matter, *Civil Rights Commission v Chrysler Corp,* 64 Mich App 393; 235 NW2d 791 (1975). Pursuant to the remand ordered in that opinion, the circuit court has now passed on the merits of Boyd's claim and found that his discharge was not racially

* Circuit judge, sitting on the Court of Appeals by assignment.

motivated, but rather the result of his poor work performance, as claimed by the employer.

Boyd was discharged from his job as a hi-lo driver on April 25, 1968. Boyd was originally hired by Chrysler in 1944 and, although his specific job inside the plant had varied, he had been a hi-lo driver since that time. Boyd's service with Chrysler was lengthy, but his last years were checkered with disciplinary proceedings, disciplinary layoffs and at least one previous discharge.

The discharge with which we must concern ourselves was precipitated by Boyd's transfer from a job inside the plant to an outside job at the salvage yard adjacent to the plant. This transfer was necessitated by Boyd's presentation of a doctor's certificate which, after evaluation by the Chrysler medical staff, prevented Boyd from working inside the plant near smoke, gas or other airborne debris. There were no jobs which would meet this medical classification inside the plant. The company was thus put to the choice of transferring Boyd to a different department or providing him with this outside job. Boyd replaced a white man on the job outside.

Boyd's primary duty at the yard was to load bins of scrap brought from inside the plant by others onto his hi-lo and dump them in trailers for later removal from the grounds. The yard supervisor, O. C. Buckner, also had certain duties in relation to the scrap and was to aid Boyd in the performance of his duties.

I

At the time of Boyd's discharge, § 3 of the fair employment practices act, 1955 PA 251, MCLA 423.303; MSA 17.458(3), made it an unfair labor

practice for an employer to discriminate in any matter related to employment because of race.[1] Even though this statute has since been repealed, see footnote 1, our review proceeds as if under the prior act.

A panel of this Court recently noted that the Constitution provided for *de novo* review in the circuit court but made no provision for further review and concluded that Court of Appeals review was limited to whether the *commission's* decision was supported by competent, material and substantial evidence on the whole record. *Civil Rights Commission ex rel Dixon v Ford Motor Co,* 75 Mich App 59; 254 NW2d 652 (1977). We do not believe the *Ford* panel correctly decided this question. Review in the Court of Appeals must be of the circuit court's decision, not that of the commission. To hold otherwise would render the constitutionally required *de novo* review in the circuit court, Const 1963, art 5, § 29, meaningless. Also, we measure the circuit court's findings not by the standard of the Administrative Procedures Act (APA),[2] MCLA 24.201 *et seq.;* MSA 3.560(101) *et*

---

[1] The Civil Rights Commission was given authority over such claims by the Legislature in the original civil rights commission act, 1963 PA 45 (2nd Ex Sess) (MCLA 37.6; MSA 3.548[6]), after the commission was created in Const 1963, art 5, § 29.

By 1976 PA 453, effective March 31, 1977, the Legislature repealed the former unfair employment practices act, 1955 PA 251, MCLA 423.301 *et seq.;* MSA 17.458(1) *et seq.,* the Fair Housing Act, 1968 PA 112 (MCLA 564.101 *et seq.;* MSA 26.1300[101] *et seq.)* and the original civil rights commission act, 1963 PA 45 (2nd Ex Sess). The basic purpose of these former acts was reinacted by the same bill as the Michigan Civil Rights Act, MCLA 37.2101 *et seq.;* MSA 3.548(101) *et seq.* The new act specifically prohibits an employer from discharging an employee on account of race. MCLA 37.2202(1)(a); MSA 3.548(202)(1)(a). The lack of a savings clause in the new act will not affect liabilities accrued under the old act. 73 Am Jur 2d, Statutes, § 391.

[2] The panel in *Civil Rights Commission ex rel Dixon v Ford Motor Co,* 75 Mich App 59; 254 NW2d 652 (1977), drew its scope of review from Const 1963, art 6, § 28 and MCLA 24.306; MSA 3.560(206), *i.e.,*

*seq.,* but rather, by whether the findings are clearly erroneous under the standard of GCR 1963, 517.1. This was made clear by the Legislature for future cases in the 1976 act, MCLA 37.2606(3); MSA 3.548(606)(3), which provides for review from the circuit court "in the same manner and form as other appeals from that court".

## II

"The crux of a civil rights suit is that similarly situated people have been treated differently because of their race." *Franklin v Crosby Typesetting Co and International Typographical Union,* 411 F Supp 1167, 1172 (ND Tex, 1976).

The allegation that Boyd's discharge was racially motivated is based on the premise that Boyd's job as a hi-lo driver and Buckner's job as yard supervisor were so intertwined that Boyd's performance was necessarily tied to Buckner's. Boyd was fired for his failure to adequately perform his job, and yet no disciplinary action was taken against Buckner.

The type of discrimination alleged here has been labeled "disparate treatment". To make a prima facie showing of discrimination, the one claiming disparate treatment must show that he was a member of the class entitled to protection under the act and that, for the same or similar conduct, he was treated differently than one who was a member of a different race. *Pompey v General Motors Corp,* 385 Mich 537, 542, 549; 189 NW2d 243 (1971).[3] *Cf. McDonald v Sante Fe Trail Trans-*

---

whether the decision was supported by competent, material and substantial evidence on the whole record.

[3] In *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971), the Supreme Court held that the statute created a private cause of action and that one who had been the victim of discrimina-

*portation Co,* 427 US 273, 282–283; 96 S Ct 2574; 49 L Ed 2d 493 (1976).

In this case, the hearing examiner heard all the testimony and concluded that Boyd had failed to carry his burden of showing that race was the reason for his discharge. The commission, based on this same evidence, found that Boyd's performance was directly related to Buckner's and that Chrysler's failure to provide adequate training, plus its failure to discipline Buckner, raised an inference that Boyd's discharge was racially motivated.

The circuit court also made its decision on the basis of the record made before the administrative law judge. This was proper. *Burrell v Annapolis Hospital,* 36 Mich App 537; 193 NW2d 900 (1971). Although the circuit court's opinion is not as concise as it could have been, it concluded that Boyd failed to show, by a preponderance of the evidence, that his discharge was racially motivated. We review that conclusion to determine if it is clearly erroneous.

### III

In deciding whether Boyd has made a prima facie showing of disparate treatment, several principles must be kept in mind. First, the prima facie

tion need not proceed through the Civil Rights Commission. The Court also held that the complaint in *Pompey* stated a prima facie case of racial discrimination. An examination of the complaint filed in that case shows that plaintiff alleged that he was a Negro, that he and other white crane operators were similarly situated in that they had been disciplined and suspended for infraction of company rules, and, that only plaintiff, a Negro, had been demoted because of the infractions.

We think that an alternative prima facie case would be available to one who showed that he was black, that he was discharged, and that the person discharging him was predisposed to discriminate against blacks and had actually acted on that disposition in discharging him. *Taylor v Safeway Stores Inc,* 365 F Supp 468 (D Colo, 1973) *affirmed in part, reversed in part,* 524 F2d 263 (CA 10, 1975).

showing of discrimination which Boyd is responsible for making is not merely presentation of enough evidence to avoid a directed verdict, as if this were a jury trial, but rather, presentation of enough evidence to entitle him to a judgment if a nondiscriminatory reason for the discharge is not shown. *Flowers v Crouch-Walker Corp,* 552 F2d 1277, 1283, n 4, (CA 7, 1977), *Woods v North American Rockwell Corp,* 480 F2d 644, 647 n 3 (CA 10, 1973).[4]

Second, all the evidence presented must be considered, there is no need to ignore opposing evidence to determine if Boyd has made a prima facie case. If the company can refute a claim of disparate treatment, it need not shoulder the burden of proving a valid nondiscriminatory reason for the discharge. *Henry v Ford Motor Co,* 553 F2d 46 (CA 8, 1977).

With these principles in mind, we examine the evidence which plaintiffs claim raises the inference of discrimination.

## IV

The Attorney General states that the sole claim of discrimination here is based on the theory of disparate treatment. A necessary part of determining whether similarly situated persons were treated differently is to determine whether, in fact, they were similarly situated. Chrysler contends

---

[4] We agree with the position taken by all the parties in this case that it is appropriate to rely on Federal decisions in making our decision. Federal legislation (Civil Rights Act of 1964, Title VII [42 USC 2000E, *et seq.]),* also prohibits racial discrimination in employment. The Federal courts have had a much greater opportunity to review questions dealing with racial discrimination in employment than have the state courts. We believe that Federal precedent, although not binding, is persuasive in determining what the substantive law of racial discrimination in employment is at the present time.

that the jobs were not so interrelated as to cause performance at one to equal performance of the other.

Boyd had been a hi-lo driver since he was hired by Chrysler in 1944. Buckner's duties did not include driving a hi-lo. Boyd claims that although he was a competent hi-lo operator, he needed instruction and assistance from Buckner in order to perform this particular job.

No evidence was presented which would indicate that Buckner, or anyone else, gave more instruction or more assistance to white drivers who held this job before Boyd. The employer cannot be held liable for failure to train an employee to perform a particular task absent a showing that this failure constituted dissimilar treatment. *Long v Ford Motor Co,* 496 F2d 500 (CA 6, 1974).

Nor can we conclude that Buckner's cooperation was essential to Boyd's job performance. Boyd's job was to pick up the bins of scrap on the prongs of his hi-lo and dump them into trailers. A part of Buckner's job was to make sure that the scrap in these bins was properly sorted before being dumped into the appropriate trailer and to remove usable material which had erroneously been scrapped.[5] The only testimony on the point shows that 80% of the bins brought from inside the plant required no sorting by Buckner.[6]

---

[5] There were five categories or types of scrap: (1) welding rod, (2) galvanized metal, (3) number one baling material, (4) heavy prepared or unprepared pieces and, (5) junk of all kinds including ducts, steel tables, steel chairs, banding iron, wire mesh, fencing and anything else that is worthless.

Dumping the scrap was Boyd's primary job. Because he never dumped all of the available bins he did not do the secondary tasks which were part of this job. Additional workers were brought from within the plant to do these tasks and relieve the dangerous condition which resulted. The testimony by Chrysler employees showed that only Boyd had trouble completing all of the tasks which were part of this job.

[6] Buckner's cooperation was needed if the bin brought from inside

Boyd argues that he could not dump even these bins because he needed Buckner to identify the type of scraps, see note 5, and point to the proper trailer. The record contains photographs of the various types of scrap involved in this operation. They seem easy enough to distinguish from one another. Indeed, Boyd's own testimony establishes that he could distinguish one type of scrap from another even though he could not name them. The testimony indicated that a new driver may need help in identifying the types of scrap for the first few days, but not thereafter. Boyd had been on the job a sufficiently long period to be able to identify these types of scrap.

Even if his theory concerning the lack of cooperation by Buckner is given full credit, Boyd's testimony at the hearing before the commission included a different reason for his poor work performance. At the hearing, Boyd testified that he was often away from his hi-lo warming himself in the guard shanty because of the cold and a troublesome hemorrhoid condition.[7]

Based on our review of the entire record, we conclude that Boyd did not make a prima facie showing that he was treated differently than any other similarly situated person. He was not simi-

---

the plant needed to be chained to the prongs of the hi-lo. Because of the construction of some bins, this was necessary to prevent dumping a bin into the trailer when the scrap was dumped. Testimony shows that this was necessary for only two or three bins a day. There was no testimony that Buckner was unavailable to chain the bins when necessary.

[7] Other testimony, supported by photographs, showed that the operator's area on Boyd's hi-lo was enclosed and heated. We also note that Boyd's work in the salvage yard took place entirely during the day and entirely during the month of April.

We also note that Boyd made no complaint about either of these conditions until after his discharge. The company could not be expected to help Boyd cope with these problems, and thus aid his job performance, unless it was aware of them.

larly situated with Buckner and he presented no proof as to any other individual. The circuit court was not clearly erroneous in finding that Boyd had failed to sustain his burden of proof.

Affirmed.