830 F.2d 194
 45 Fair Empl.Prac.Cas. 300,
45 Empl. Prac. Dec. P 37,777
Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Patsy JAMISON, Administratrix of the Estate of Daniel
Jamison, Deceased, Plaintiff-Appellee, Cross-Appellant,
v.
STORER BROADCASTING COMPANY, Defendant-Appellant, Cross-Appellee.
 Nos. 83-1170, 83-1244
 United States Court of Appeals, Sixth Circuit.
 September 30, 1987.
 
 Before WELLFORD and DAVID A. NELSON, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Defendant Storer Broadcasting Company appeals from a judgment entered on a jury verdict awarding damages under Michigan's Elliott-Larsen Act for reverse discrimination in the company's firing of a white television sportscaster, Daniel 'Red' Jamison. Plaintiff Patsy Jamison, Administratrix of Mr. Jamison's Estate, cross-appeals from a judgment notwithstanding the verdict on a wrongful death claim predicated on the theory that Storer's discharge of Mr. Jamison caused him to commit suicide. We shall reverse the judgment on the reverse discrimination claim and affirm the judgment on the wrongful death claim.
 
 
 2
 * During 1975 the management of Storer's Detroit television affiliate, WJBK-TV, undertook to replace its weekend sportscaster. The station's first choice was Charlie Neal, a black sportscaster for one of the major Detroit radio stations. Mr. Neal had previously worked as a sportscaster for a Philadelphia television station, and his work in Philadelphia had favorably impressed the station manager for WJBK. Because of scheduling conflicts and an inability to come to terms on salary, Mr. Neal refused the WJBK offer. Neal's refusal forced Storer to look elsewhere, and on November 13, 1975, it hired Mr. Jamison. Storer paid Mr. Jamison $28,000 per year, which represented a $15,000 increase over what he had been making at his last job as a sportscaster for a television station in Huntsville, Alabama.
 
 
 3
 Mr. Jamison's performance during his first months with WJBK was clearly unsatisfactory. He had problems with pronunciation, with inaccurate statements, with inappropriate ad-libs, and with the coordination of his narration with film clips. Mr. Jamison ultimately improved somewhat, but was always considered the weak line of the WJBK news team. In October of 1976 the station's management gave him the lowest performance evaluation of all on-air employees; he received a rating of 'satisfactory', while all of the other on-air performers received ratings of 'outstanding' or 'highly satisfactory.'
 
 
 4
 In January of 1977 Storer officials met with Mr. Jamison to discuss his performance problems and a recent drunken driving arrest. Soon thereafter, according to a Storer official, a public opinion survey revealed that 'the public attitude about Mr. Jamison's performance was very bad; that he was not accepted in the marketplace.' The station decided that Mr. Jamison would have to go, and it got back in touch with Mr. Neal, the man who had been offered the job in 1975. This time Mr. Neal accepted WJBK's offer, agreeing to begin as the weekend sportscaster on April 22, 1977.
 
 
 5
 Mr. Jamison was not told of his discharge until the day Mr. Neal took over. The union contract governing the employment relationship allowed for summary discharge because of 'unsuitability for program requirements.' This provision, which is standard throughout the industry, reflects an understanding that the competitive nature of broadcast journalism rules out the sort of job security enjoyed by workers in some other fields.
 
 
 6
 Mr. Jamison was told to clean out his desk and leave the premises immediately. The Storer officials who told Mr. Jamison of his discharge gave him to understand that while he had performed reasonably well, his style was simply not going over in the Detroit market. They testified at trial that their statements to him were not entirely true, but they had wanted to soften the blow as much as they could.
 
 
 7
 Mr. Jamison returned to Huntsville with his wife and two children. Then in September of 1977 he accepted a job with a Columbus, Ohio, cable television station, and left his family in Huntsville. Mrs. Jamison obtained a divorce in February of 1978. Mr. Jamison lost his Columbus job the following August, and in November of 1978 he began work as a newscaster in Scranton, Pennsylvania. He lost that job in April of 1979. Soon thereafter he found work as a part-time news reporter for a television station in Nashville, Tennessee, and he took a second job as a night clerk at a Holiday Inn in Nashville. On July 29, 1979, having grown progressively more depressed ever since his firing from WJBK, Mr. Jamison hanged himself in the Nashville hotel room in which he lived.
 
 
 8
 This lawsuit was originally filed by Mr. Jamison himself shortly after his discharge in 1977. The complaint alleged reverse racial discrimination under Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. Secs. 37.2101, et seq. The action was removed to federal court on diversity grounds. After Mr. Jamison's death his former wife was substituted as plaintiff in her capacity as administratrix, and the district court allowed an amendment to the complaint to set forth a wrongful death claim. Mr. Jamison's suicide was alleged to have been the result of an irresistible impulse caused by psychological disorders brought on by the wrongful discharge.
 
 
 9
 After a bifurcated trial on liability, the jury found Storer liable for both reverse discrimination and wrongful death. Evidence was then presented on damages, and the jury awarded $200,000 for wrongful death and $35,000 for wages lost after the discharge. The trial court granted Storer's motion for judgment notwithstanding the verdict on the wrongful death claim, but not on the reverse discrimination claim. Thereafter the trial court decided that the portion of the total award properly attributable to damages sustained prior to Mr. Jamison's death could not be determined with sufficient specificity, and a second jury was impaneled to find the amount of those damages. The second jury returned a verdict for $135,000, and judgment was entered against Storer in that amount.
 
 II
 
 10
 In trying cases under the Elliott-Larsen Civil Rights Act, the Michigan courts take an approach similar to that followed by federal courts in trying employment discrimination cases arising under federal law.
 
 
 11
 'The burden of proof in an employment discrimination case was stated in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-253 . . . (1981), reaffirming the holding of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973):[2]
 
 
 12
 'First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant in 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' * * * Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."
 
 
 13
 We have been unable to find any Michigan cases dealing with reverse discrimination. It is well settled in the federal courts, however, that a party seeking to establish a prima facie case of reverse discrimination carries a somewhat heavier burden than a plaintiff who is a member of a protected group:
 
 
 14
 'In a case of reverse discrimination, the presumption that the circumstances which normally make out a prima facie case are indicative of discrimination is not available, absent a showing that 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981) (footnote omitted).'
 
 
 15
 Jasany v. United States Postal Service, 755 F.2d 1244, 1252-53 (6th Cir. 1985). Elaborating on this 'background circumstances' requirement, the Court of Appeals for the District of Columbia Circuit noted in Parker that the plaintiff could satisfy the requirement by convincing the court that 'evidence of [defendant's] unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely . . ..' Parker, 652 F.2d at 1018. Cf. Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 68 (6th Cir. 1985).
 
 
 16
 In the case at bar the plaintiff failed to demonstrate any past discrimination by Storer against whites. Prior to the arrival of Mr. Neal, all of the station's on-air personnel were white. The evidence does indicate a preference for Charlie Neal over Red Jamison, but the evidence does not show that this preference had an impermissible racial basis; it merely shows that there was reason to believe that Mr. Neal would do a better job for the station than Mr. Jamison.
 
 
 17
 At oral argument counsel for the plaintiff advanced a theory of 'motive and circumstances' in support of the claim of reverse discrimination. It was pointed out that WJBK had a financial interest in attracting viewers in Detroit's substantial black community and was losing viewership among blacks. Plaintiff's counsel represented that WJBK lost 20% of its black viewers during the time that Mr. Jamison was with the station. But counsel could not provide us (and apparently did not provide the jury) any figures on whites or on viewers as a whole. It is doubtful whether the 20% figure could have had legal significance under any circumstances, but clearly it could have none when the jury did not know what was happening to the total viewership.
 
 
 18
 Plaintiff also asserts that Storer had sometimes affirmatively sought out qualified minority applicants to fill open positions. There is no indication that Storer ever fired any of its numerous white employees simply to make room for a black, however, nor is there any indication that Storer ever discriminated against whites in making promotions. Absent that kind of invidious discrimination, we cannot believe that Michigan law forbids a television station to recruit employees actively in those segments of the community the station is trying to reach with its programming.
 
 
 19
 The judgment notwithstanding the verdict on the wrongful death claim is AFFIRMED. The judgment for the plaintiff is REVERSED and the case is remanded with instructions to enter judgment for the defendant on all claims.
 
 
 
 [2]
 It is appropriate to rely on federal precedent in deciding discrimination cases [brought under state employment discrimination law]. See Civil Rights Comm. v. Chrysler Corp., 80 Mich.App. 368, 375, fn. 4, 263 N.W.2d 376 (1977)
 Jenkins v. Southeastern Michigan Chapter, American Red Cross, 141 Mich.App. 785, 369 N.W.2d 223, 227-28 & n. 2 (1985).