Frances JONES, Beverly Harder, Eleanor Murray, Linda Nickel, and Mary Ruane, Jointly and Severally, Plaintiffs,

v.

CASSENS TRANSPORT and Local 299, I.B.T., Jointly and Severally, Defendants.

Civ. A. No. 78–73078.

United States District Court, E. D. Michigan, S. D.

May 7, 1982.

Ronald Reosti, Detroit, Mich., for plaintiffs.

A. Read Cone, Bloomfield Hills, Mich., for defendant Cassens.

Ted J. Cwiek, Detroit, Mich., for defendant Union.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiffs, five female office employees of the Square Deal Cartage Company until it was purchased by defendant Cassens Transport in August, 1977, filed their complaint in this matter in Wayne County Circuit Court for the State of Michigan on November 16, 1978. They claimed that both defendants had discriminated against them because of their sex in violation of the laws of Michigan, in refusing to permit plaintiffs to bid or apply for jobs at Cassens because they were women. The complaint further charged the union with breach of its duty to fairly represent plaintiffs, either in negotiations with defendant Cassens concerning the job rights of Square Deal employees, or in a grievance against defendant Cassens' refusal to hire the plaintiffs.

Defendant Local 299 petitioned for removal to this court on November 30, 1978, because the claim of breach of a duty of fair representation presented a federal question under § 301 et seq. of the Labor Management Relations Act, 1947, 29 U.S.C. § 185, et seq., and because a federal ques-

tion of the violation of Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., had been raised. Removal was proper, and this court's jurisdiction is appropriate. 28 U.S.C. § 1441.

Both defendants thereafter answered, raising affirmative defenses which will be discussed below. An amended complaint was filed February 27, 1979, claiming defendants' violations of Title VII, 42 U.S.C. § 2000e et seq. Plaintiffs Jones, Harder, Murray and Ruane had obtained Right-to-Sue letters from the United States Equal Employment Opportunity Commission dated January 22, 1979, on the basis of charges which they had filed against Cassens, but not against Local 29, on January 18, 1978. Plaintiff Linda Nickel had filed no charge and received no letter.

Plaintiffs had also filed charges with the National Labor Relations Board in January, 1978, that unfair labor practices had been committed by Cassens Transport in its alleged refusal to hire them because of their union membership. Those charges were later resolved by a settlement which included plaintiffs' waiver of any right to office jobs at Cassens as one of its terms. This court, nevertheless, took evidence at trial herein concerning Cassens' failure and refusal to hire plaintiffs into its office. That evidence is relevant to the issues of sex discrimination and fair representation presented herein, despite the settlement's preclusion of a grant of office work at Cassens to plaintiffs as a remedy here available.

Trial was held from January 2 through 20th, 1982, on the issue of liability alone. The issue of a remedy, if any, was bifurcated and deferred. Both defendants moved to dismiss at the close of plaintiffs' case, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The motion of defendant Cassens was denied, inasmuch as plaintiffs had made a prima facie case of intentional sex discrimination under both Title VII and under Michigan's Elliott-Larsen Act, M.C.L.A. § 37.2101 et seq., pursuant to which the same standards are to be applied. See *Michigan Civil Rights Commission ex rel. Boyd v. Chrysler*, 80 Mich.App. 368, 263 N.W.2d 376 (1977).

■ The court granted the union's motion to dismiss plaintiffs' Title VII claim, however, for their failure to have presented any charge against the union to the EEOC, or to have complained against union conduct during an EEOC investigation. No such investigation had occurred, in this case. The court considered the requirement of Title VII that a claim first be presented to the EEOC to be a jurisdictional requirement. The United States Supreme Court has ruled on this question subsequent to this trial, however, in *Zipes v. Trans World Airlines, Inc.,* —— U.S. ——, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). That ruling requires this court to reinstate plaintiffs' Title VII claim against the union herein. The Supreme Court has stated that:

> By holding compliance with the filing period to be not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires, we honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer. (At p. ——, 102 S.Ct. at p. 1135)

If there can be a case in which equity requires relief from the filing requirement, this is one. As is fully discussed below, both defendants herein pursued a course of secrecy and concealment in their dealings with the plaintiffs; and plaintiffs each testified that they were told by EEOC personnel that the EEOC could afford them no relief against the union when they filed their charges against the employer. They were misadvised (either wilfully or inadvertently) by every source of representation with which they consulted until they reached the judicial process, and will not be penalized here by a technical requirement. Their Title VII claim is reinstated, against the union.

The court denied defendant union's Rule 41 motion to dismiss plaintiffs' claim of breach of the duty of fair representation, and pendent thereto retained plaintiffs' discrimination claim against the union under the Michigan Elliot-Larsen Act. Accordingly, all proofs appropriate to adjudication of the now-reinstated Title VII claim are of record.

The proofs now having been completed, and post-trial briefs of the parties considered, the court finds for the reasons fully discussed below that judgment must be and hereby is entered for plaintiffs on the issue of liability.

■ In a claim of disparate and unlawfully discriminatory treatment, plaintiffs under either Title VII or the Michigan Elliot-Larsen Act must prove a *prima facie* case by a preponderance of all of the evidence which "consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977). The requirements of the *prima facie* case on a complaint of discriminatory nonselection, as stated by *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, (1973), are that the plaintiff show that (1) she belongs to a minority or statutorily protected group, (2) that she applied for and was qualified for a job for which the employer was seeking applicants, (3) that despite her qualifications she was rejected, and (4) that after her rejection the job remained open and the employer continued to seek applicants from persons with plaintiff's qualifications. A *prima facie* case may also be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

As the court stated in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less

favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical*, although it can in some situations be inferred from the mere fact of differences in treatment .... Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra*, at 349 [97 S.Ct. at 1861]. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. *Compare, e.g. Griggs v. Duke Power Co.*, 401 U.S. 424, 430–434 [91 S.Ct. 849, 853–855, 28 L.Ed.2d 158], with *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802–806 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668]. 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n. 15. (Emphasis added.)

█ When a court concludes that a Title VII (or Elliot-Larsen) plaintiff has proven a *prima facie* case of disparate treatment or impact, then the court must consider the defendant's explanation or justification for the presumptively discriminatory action or practice. The type of defense that the defendant must then articulate depends upon the type of claim asserted by the plaintiff. In a disparate treatment case, the defendant must articulate "a legitimate nondiscriminatory reason" for its actions. *McDonnell-Douglas, supra.* In a disparate impact case, the defendant must present evidence that the challenged test, procedure, or requirement, bears "a manifest relation to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977), quoting *Griggs, supra*; unless the procedure in question is encompassed within a statutory exception. See *Teamsters, supra.* In either case, the burden of going forward is then placed upon the defendant to articulate a nondiscriminatory rationale. Thereafter, the disparate treatment plaintiff may still prevail if she can, finally, establish by a preponderance of the evidence that the apparently nondiscriminatory rationale which was articulated by the defendant served only as a pretext for the in fact intentionally discriminatory acts or practices in question. *See, Board of Trustees of Keene St. College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073, (6th Cir. 1980). The *Grano* court further noted, at footnote 7, 637 F.2d at 1081, that:

Because discriminatory intent is so difficult to prove by direct evidence, it is incumbent upon a sensitive decision maker to analyse all of the surrounding facts and circumstances to see if discriminatory intent can reasonably be inferred. See *Arlington Heights v. Metropolitan Housing Development Co.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

On the basis of the settled law outlined above, and the findings of fact set out below, this court finds that plaintiffs herein have made a *prima facie* case on the preponderance of all of the evidence that defendants herein disparately treated and unlawfully discriminated against them on the basis of their sex; that defendants have failed to articulate legitimate nondiscriminatory reasons for their disparate treatment of plaintiffs; and that such reasons as defendants have suggested for their conduct are in fact pretextual for unlawful sex discrimination, in violation of the Title VII of the Civil Rights Act of 1964, as amended, and the Michigan Elliot-Larsen Act, M.C.L.A. § 37.2101.

Also, for the reasons explained below, the court specifically notes that the claim of both defendants that their conduct toward plaintiffs was immunized from liability by the protection which Title VII affords a bona fide seniority system under § 703(h) is utterly and absolutely without merit. Defendants not only were not required by any seniority system to discriminate against plaintiffs as they did; but they in fact discriminated in violation of the applicable contract provisions.

■ Defendant union, this court finds, breached its duty to fairly represent plaintiffs, under the circumstances presented. The standards applicable to that claim were definitively stated in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) in which all unions certified under the National Labor Relations Act were held to have the statutory duty to represent all employees in the collective bargaining unit represented fairly, both in collective bargaining with the employer, and in enforcement of any resultant contract. That duty includes the obligation to serve the interests of all members without hostility or discrimination towards any. Both unit members and employers should be assured that similar complaints will be treated consistently. A breach of this duty occurs when a union's conduct towards a member of its unit is arbitrary, discriminatory, or in bad faith. *Vaca* refers us to *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), a case which is particularly apposite because it treats the question of fair representation when one employer absorbs the business (and seniority lists) of another, in a multi-employer bargaining unit represented by one union and covered by a collective bargaining agreement which specifically provides (as does this one) that the seniority status of all affected employees may be submitted to a Joint Arbitration Committee.

In *Humphrey*, certain of the employees of the absorbing employer (equivalent to Cassens' employees, here) sued the union, claiming breach of its duty after they were laid off as a result of the Joint Arbitration Committee's dovetailing of the two employers' seniority lists. In rejecting the claim of those plaintiffs, the Supreme Court relied upon a series of findings which the record in this case clearly fails to suggest. The court noted that the *Humphrey* plaintiffs had been made aware of the struggle for jobs simultaneously with the other employees concerned; had been given notice of the adjudication of their rights which would occur before the Joint Arbitration Committee, and had been given a fair hearing before that body on the issue. Moreover, it

was noted that the collective bargaining agreement had empowered the arbitration committee to integrate the seniority lists on some rational basis and that such had indeed occurred; and finally that a union is not guilty of such a breach when it takes a good faith position contrary to the interests of some individuals represented, and that the position taken had indeed been a good faith one.

■ In this case, the struggle for jobs, the adjudication of their rights, and the very fact of a Joint Arbitration Committee hearing were all kept secret from these plaintiffs until their employment had terminated and they were not given a fair hearing before the decision making body at any meaningful time. Their position was not even presented to the Joint Arbitration Committee and it did not, therefore, adjudicate their rights on any rational basis other than by omission. Moreover, the Joint Arbitration Committee's decision did not require the actions thereafter taken against plaintiffs by both defendants. The position against plaintiffs which was taken by the union was not a good faith position, but one based upon invidious discrimination and no other reason. Under authority of both *Vaca* and *Humphrey*, accordingly, plaintiffs have made their case, by more than a preponderance, that defendant union breached its duty of fair representation to them.

■ The union has affirmatively claimed that plaintiffs failed to exhaust their administrative remedies through the contractual grievance procedure, or to pursue their internal union remedies for the alleged breach of a duty to represent. It is first noted that no internal union remedies have been shown to exist, on the record. As to the claimed failure to exhaust the grievance procedure, the record reflects the Union Business Agent's undisputed flat refusal to represent the plaintiffs in their only meeting with Cassens' executives about their loss of jobs. Business Agent Deedy testified that he absolutely refused to become involved with such a meeting and that the women's position, as he claimed to

understand it, had no merit. Of the grievances which plaintiff Jones filed, and which Union Agent Holsinger filed on plaintiffs' behalf, there is no record of any union representation at the time of their final denial by Joint Arbitration Committees. The Sixth Circuit, moreover, is not one which requires exhaustion where a union member is unaware of his or her remedies. See *Geddes v. Chrysler*, 608 F.2d 261 (6th Cir. 1979). These plaintiffs, undisputedly, were not only unaware of their remedies but were deliberately deprived of notice of the arbitral adjudication of their rights upon which the union here relies. Similarly, the union's claims that plaintiffs' claims are barred by a grievance arbitration award, and that they failed to timely appeal an arbitral award, are also without merit under circumstances in which the award relied upon was obtained in secrecy from plaintiffs and without consideration of their interests.

The union's conduct towards these plaintiffs was, on the facts set out below, plainly sex-based discrimination; and evinced the clear intention of the union (from the first notice of Cassens' purchase of Square Deal) to prevent these women from utilizing their terminal or company seniority to compete for jobs against similarly situated men. Such conduct breaches a union's duty to fairly represent all bargaining unit members.

## FINDINGS OF FACT

On June 3, 1976, defendant Cassens Transport, the Square Deal Cartage Co., and Gate City Transport Co. executed a contract by which Cassens was to purchase all property and assets of Square Deal and Gates. All three companies were engaged in the business of hauling new automobiles by truck, and they utilized contiguous premises as their respective Detroit terminals. At that time, the five female plaintiffs herein were employed in the Square Deal Detroit Terminal Office as clerical workers; and were represented by defendant Local 299 as were most of the employees of all three companies. Mr. Wilson Holsinger, who was Director of the Teamster Carhaul Division during the events here in litigation, testified that he had helped organize the Square Deal Office in 1958, while he was the Square Deal steward for yardmen and drivers.

The culmination and execution of Cassens' purchase of Square Deal was delayed until August 26, 1977, because of the necessity for federal regulatory approvals of the transaction. It was on that date that plaintiffs were each called into the Square Deal Manager's office, individually, and notified of the conclusion of their employment. The last and most senior of the plaintiffs, Ms. Jones, had been effectively terminated by November of 1977.

Due to the union's efforts during the year-long interim between contract and executed purchase, all other Square Deal employees, all of whom were male except the secretary to the chief operating officer and receptionist, had moved to work at Cassens on the date of the takeover with full seniority. The union's efforts on behalf of the Square Deal work force, except for plaintiffs, had commenced through meetings with Cassens beginning immediately after the June, 1976 contract of sale, more than a year prior to plaintiffs' job loss. Cassens did continue an office function thereafter and, indeed, expanded considerably after the absorption of Square Deal's work force with additional new hires into its office, all but two of whom were male. The President of Square Deal from 1974 to 1977, Mr. Harold Jones, became the Terminal Manager of Cassens. Mr. Jones had started with Square Deal in 1948 and worked in managerial positions since the mid-fifties. The strong opinions which he had expressed and implemented at Square Deal, relating to female employees, may fairly be said to have been taken to Cassens.

The defendant Local 299 had organized the employees of Cassens, Square Deal, and Gates at least twenty years prior to this consolidation and it is undisputed that the terms and conditions of employment of all employees affected by these events were governed by the Teamsters National Master

Automobile Transporters Agreement, the Central and Southern Conference Areas Supplements thereto (specifically Truckaway, Driveaway, City Delivery, Yard and Garage Workers', and the Michigan Office Workers' Supplements thereto.) All contracts were effective by their terms from June 1, 1976 through May 31, 1979.

At Square Deal, Local 299 had historically represented employees on three seniority lists, and defendants herein have designated (improperly, as will be seen) each of those lists as a "separate and distinct bargaining unit."

Plaintiffs were on the office seniority list; and it is that alleged distinctiveness as a bargaining unit which defendants claim required their preclusion from competing for jobs at Cassens. The Garage employees at Square Deal were on another seniority list; and the third list included all drivers and yardmen. At Cassens the office was not organized. There was no garage at the Cassens Detroit Terminal, and there were two seniority lists: one for drivers and one for yardmen. The practice of listing drivers and yardmen on separate seniority lists was the usual pattern in the autohaul industry, and Square Deal's combined driver-yard list was a rare aberration. It was the only employer in the Detroit area with a combined list, which had been agreed upon between the employer and the union (after a referendum of all drivers and yardmen) in 1958. It is the existence of this aberrational list, which defendants insist constituted a "distinct bargaining unit", which has led to the difficulties at hand.

All employees concerned herein worked under the Teamsters Master Transport Agreement, which provided as follows concerning the supplements thereto:

All such Supplemental Agreements are subject to and controlled by the terms of this Master Agreement and are referred to herein as "Supplemental Agreements." All such Supplemental Agreements are to be clearly limited to the specific division and classifications of work as enumerated or described in each individual Supplement. (Article 2, p. 3)

\* \* \* \* \* \*

The employees, unions, employers and Association, covered by this Master Agreement and the various Supplements thereto shall constitute one bargaining unit. It is understood that the printing of this Master Agreement and the aforesaid supplements in separate Agreements is for convenience only and is not intended to create separate bargaining units. (Article 2, p. 5)

The Master Transport Agreement further provided as follows, here pertinent:

The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's age, race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of age, race, color, religion, sex or national origin.

\* \* \* \* \* \*

In those terminals where classification seniority applies, the parties agree that in filling vacancies with qualified employees which occur subsequent to the execution of this agreement, the principle of carry-over terminal seniority shall be recognized. In the event that the Employer and Local Union fail to formulate a Rider which provides for the filling of vacancies consistent with the foregoing provision, the Joint Area Committees shall have authority. (Article 26, pp. 57–58).

\* \* \* \* \* \*

Terminal seniority rights for employees as provided under this Agreement and all Agreements supplemental hereto shall prevail. (Article 5, § 1, p. 16).

\* \* \* \* \* \*

*Merger, purchase, acquisition, sale, etc.:*
(1) The terminal seniority lists of the two companies should be dovetailed so as to create a Master Seniority list or lists based upon total years of service with either company. This is known as

"dovetailing" in accordance with years of seniority. (Article 5, p. 17).

\* \* \* \* \* \*

. . . The Conference Joint Arbitration Committees provided in the National Master Automobile Transporters Agreement or the Supplemental Agreement shall have the authority to determine the establishment and application of seniority in those situations presented to them. In all cases, the seniority decisions of the National Committee of Conference Joint Arbitration Committees . . . shall be final and binding. (Article 5, § 4, p. 23.)

Plaintiffs herein were represented by Local 299 not only under the above-quoted Master Agreement, but under the Teamsters Michigan Office Workers Supplement thereto, to which Square Deal was a signatory employer but defendant Cassens was not, as its office was not organized. The Office Supplement's relevant provisions concerning seniority (at Article 39) were as follows:

Company seniority for employees governed by this Agreement shall be defined as the period of employment with the Company since the employee's last date of hire. Terminal seniority for the employees covered by this Agreement shall be defined as the period since the employee's last employment at the physical location covered by this Agreement. (Article 39, § 1, p. 4)

The Company shall prepare a company seniority list and Terminal Seniority list within 30 days of the signing of the Agreement. One copy of such list shall be furnished to the Union and one copy shall be posted in a conspicuous place in the terminal. Any objection to either company and/or terminal seniority on the part of an employee must be filed with the company within 7 days of the posting of this list.

This seniority list shall be amended to include all changes each 90 days and the same provisions for appeal against company and/or terminal seniority dates reported thereon shall apply . . . . (Article 39, § 6, p. 7)

The Yardworkers' Supplement, Part IV of the Master Transport Agreement, governed the employment of yardmen of both Cassens (who were listed on a yard seniority list) and of Square Deal (who were listed on a merged yard-driver list) at the time of the acquisition. As to seniority, the Yard Supplement provided:

Seniority shall be recognized on job assignments whenever practicable, provided the senior employee can qualify. (Article 76, § 2, p. 172).

Cassens had no garage workers until it absorbed all those of Square Deal, on August 26, 1977. At all times relevant hereto, defendant Union represented them under the *Garage* Supplement of the Master Transport Agreement. That supplement provided as follows, concerning seniority:

§ 1(a) Company garage seniority shall be determined by the time and date each employee's payroll earnings begin, as of his last hire-in date.

(b) Garage employees should not bump into any other division nor shall any employee from another division exercise seniority in the garage.

(c) Classification seniority shall commence at the time and date each employee's payroll earnings begin in such classification.

\* \* \* \* \* \*

§ 4 A current seniority list, complete with classification date and employment date, must be posted where it will be accessible to the employees at all times, and a copy of same shall be mailed to the Union. [Article 80, pp. 175, 176].

Despite all of the above provisions there is no evidence that any seniority list was ever posted at Square Deal, between 1955 and 1977. Those plaintiffs who had seen any of the three lists which were maintained had seen them because plaintiff Frances Jones was occasionally called upon to type them.

That the above-quoted collective bargaining agreement clauses recognize classification seniority, terminal seniority and company seniority, and uniformly require that

terminal or company seniority shall prevail, with the one exception of the prohibition of bumping into or out of the Garage "division." Only one single bargaining unit is recognized, and even the garage community is distinguished by the appellation "division", rather than "bargaining unit." Only in the garage, moreover, is *classification* seniority recognized, and accordingly required to be listed. It is also noteworthy that, despite all of the above requirements, Square Deal maintained no company seniority list or terminal seniority list, whatsoever. If it existed, it has never been mentioned or produced at any time relevant hereto. Similarly, if Cassen's ever had a terminal or company seniority list it was not utilized, mentioned or produced during the events here under examination or at trial. Defendants herein utilized only *classification* seniority lists to determine job entitlements at the time of the Cassens' acquisition of Square Deal; and they did so in violation of every applicable contract clause and of the arbitral decision on which they here rely, as well.

Long before the Cassens' acquisition of June 1976 was to be effectuated, the question arose as to how Square Deal employees would be transferred to the Cassens' yard. Square Deal had its longstanding yard-driver seniority list, but an employee, once placed on Cassens' yard list would no longer have status to bid for driving routes and maintain simultaneous seniority in both yard and driver classifications as he had done at Square Deal. It had been a foregone conclusion that all garage personnel would transfer from Square Deal with full seniority and become the Cassens garage staff. As to the Square Deal office workers: union witnesses testified that their future was never discussed; and Cassens' witnesses claimed, to the contrary, that the position was taken *ab initio* that Cassens would not accept them.

Accordingly, to resolve the only perceived uncertainty, the question of the Cassens' yard, in August of 1976, (more than a year before the acquisition's effective date) Cassens President Jerry Shashek filed a request with the Joint Arbitration Committee

of the Central-Southern Conference Teamsters:

... for determination with respect to establishment of seniority board at Cassens Transport Company arising out of the purchase by Cassens Transport Company of Square Deal Cartage Company and Gate City.

That submission was made pursuant to the above-quoted Article 5, § 1(1) ("Mergers", at p. 17) of the National Master Transport Agreement. The question was referred to a subcommittee on August 28, 1976; and that subcommittee's subsequent report indicates that it "... met on Tuesday, September 21, 1976 with all interested parties *including employees from the various companies involved in these proceedings.*" [Emphasis added.] Defendant Local 299 is recorded as having represented the employees, and having "stated it preferred the employees' company seniority be used." Wilson Holsinger testified that he presented the union's position, and argued for "Master" seniority.

The Subcommittee's Decision, of January 31, 1977 was first, that all drivers of the merged employers be dovetailed by years of service. As to the yard at Cassens, the decision was:

(a). Cassens practice of maintaining separate yard seniority list shall be maintained. (Referring to present 8 Cassens yard employees, plus 7 from Square Deal and 2 from Gate City.)

(b). The new yard seniority list, after merger, shall be prepared in the same way as the drivers' list, by master seniority as provided in Article 5, Section 1, Subsection (1) and (2).

Reference to the cited Article reveals that "Master" seniority is a term used by these parties interchangeably with *company* seniority, meaning "total years of service with either company."

On February 4, 1977, the Joint Arbitration Committee adopted the report of the Subcommittee. Until August 25, 1977, however, none of the plaintiffs had heard any more of this activity than the same

rumors of the sale of Square Deal which had commenced in 1975. No one advised them of the fact of a June 1976 sale, or of the arbitral adjudication. Union representative Holsinger testified that he could not recall ever discussing plaintiffs' future with them, prior to the actual Cassens' takeover of August 26, 1977; that he had hoped and expected that Cassens would take them, but had made no inquiries in that regard; that he had known Cassens had a non-union office, but had thought plaintiffs would be accepted up until August 25, 1977; and had told them not to worry. Plaintiff Nickels asked the Cassens' Chief Dispatcher Belevender, during this period, about the rumor of the sale and of its impact on plaintiffs' jobs. He responded that "we're watching for the good workers, to take them to Cassens." The employer's agents, like the union's, continued to tell plaintiffs not to worry, until the effective date of the transfer.

After the adjudication, Cassens, Square Deal, and the union had to determine *which seven* Square Deal employees would obtain places on the Cassens' yard list. It was decided to hold a Bid among the all-male Square Deal yard-driver listees. All yard-drivers who failed to bid for those seven places, or whose bids were unsuccessful, were to transfer their seniority to Cassens as *drivers*, if eligible. No notice of this Bid was posted; notices were handed through the Dispatch window at Square Deal to each individual who was considered eligible, according to Cassens' present Terminal Manager, Harold Jones. Those individuals were the yard-driver listees. The all-male yardworkers from the Square Deal Terminal in Toledo were also given notice and the opportunity to participate. The Bid was held from August 20 through September 6, 1977.

If plaintiffs had been permitted to Bid with terminal or company seniority, it is undisputed that at least three of them would have won jobs in Cassens' yard at that time. Cassens accepted eleven male bidders including three with less Terminal seniority than any plaintiff herein. It is also undisputed that Cassens immediately thereafter made four new male hires into its yard, for a total of 19 new persons, as opposed to the 9 contemplated by the arbitral order. The yard continued to be all male, as it always had been, and as had the Square Deal yard as well, despite the numerous requests of plaintiffs for work therein over the years.

Plaintiffs were summoned to the Square Deal executive offices individually and terminated, on August 26, 1977. The only Square Deal office employees accepted by Cassens were six men.

The union has claimed, here, that it first learned that Cassens would not accept the women of the Square Deal office on August 25, 1977. The testimony concerning these transactions of union autohaul Director Wilson Holsinger is completely incredible, however, and cannot be accepted as other than an inconsistent attempt at the fabrication of a coverup. Defendant Cassens acknowledges that it never at any time intended to or suggested that it might employ the women. The union's claim that it never knew of the employer's intention until closing day, despite the year of discussions on employment rights, the two adjudicatory events in which both sides participated, and the conduct of the Bid, is not credible. Moreover, even if it is true that the union never thought of the women until Square Deal's last day of existence, its breach of its duty to those women under such circumstances is clear, and questions of discriminatory treatment are then raised. Those questions are answered, moreover, by the union's historic sex-based animus towards the women as unit-members, and its long history of disparate and less favorable treatment of women as competitors for jobs which men might seek, often for the stated reason of their sex. Square Deal's management (which became Cassens' Management on August 26, 1977) had made it absolutely clear, over the years, that women were not wanted in the yard, as they "made trouble." There is also undisputed testimony herein that Cassens' president did not want women in the *Terminal*: and that testimony is corroborated by all of the facts here presented.

Mr. Holsinger's incredible story is that, on the afternoon of August 25, 1977, Cassens' President Shashek told him (for the first time) that the Square Deal women would not be accepted by Cassens, "because of their union membership." Thomas Deady, defendant union's Business Agent for Square Deal from 1974 through 1977, was also present. His testimony confirmed Holsinger's: Shashek stated that he wanted no union members in his office. Neither Holsinger nor Deady claim to have raised any protest to Shashek at the time; and Holsinger testified that he took no action against Shashek or Cassens thereafter because he was unaware that such an exclusion of union members was unlawful, or an unfair labor practice.

What Messrs. Holsinger and Deady did next was to invite two of the plaintiffs to meet them at a nearby bar that evening; and to advise the two women (in the bar) that Cassens had no jobs for the women officeworkers *because its office was computerized.* Holsinger and both women testified that he told them he sympathized with them, he would file a grievance on their behalf, and that he was leaving (on August 26th, the Cassens takeover date) on an extended business trip. He also, undisputedly, asked the women if they were willing to attend computer schools, independently, to enhance their attractiveness to Cassens, while he awaited the outcome of their grievance. They undisputedly agreed to pursue computer training on their own.

The women further insist, however, that on this occasion at the bar they not only agreed to seek computer training, but also asked for other work, in or out of the office, with or without seniority, in any capacity, at Cassens. Holsinger and Deady deny any such requests. Inasmuch, however, as these gentlemen undisputedly told the women a falsehood if indeed Shashek had rejected them for union membership and not for their lack of computer training, the court most certainly cannot resolve other credibility problems arising from that same conversation in the union's favor. It is noteworthy that Business Agent Deady, at that meeting of August 25 in the bar, knew that he would execute (on defendant Union's behalf) a ninety-day casual agreement for a group of three young men to start work as clerical Yard Inspectors at Cassens on August 26th, the very next day. Before the expiration of that agreement in November, Cassens had hired those young men into permanent office jobs, and trained those young men to operate its computers.

Both Holsinger and Deady steadfastly contend that no plaintiff ever in 1977, in the bar or elsewhere, asked for yard work at Cassens. Defendant Cassens claims, however, that the women did indeed demand yardwork after being foreclosed from their office jobs, but that Cassens always understood them to be demanding yard work with full seniority. Accordingly, Cassens claims that it was somehow precluded from offering plaintiffs yardwork (or any work) *without* seniority, or as new hires, even though such positions became available. Moreover, Cassens claims (through the former Square Deal President, Jones) that plaintiffs never asked to apply as new hires for any job. Obviously, both the union and the employer witnesses are, in this area, totally unbelievable.

The court credits the testimony of the two plaintiffs who, upon being summoned to the bar by their representatives and advised of their forthcoming discharge, testified that they asked for their office jobs, or for yard jobs, or for work in any capacity, as new hires or not. Their testimony was that Holsinger told them again not to worry, as he would continue to work to preserve their office jobs. As to yard jobs, however, he told them they could not bid on such work and could not perform it; indeed that they could not make it through a winter in the yard.

The next day, August 26, 1977, was the effective date of the sale of Square Deal. Each of the women office workers was called, individually and alone, into an executive office and discharged. The record indicates that Holsinger filed the promised grievance on that date, requesting hearing by the panel which had earlier adjudicated

the seniority list merger, of the question whether Cassens was obliged to accept Square Deal office workers. Also on that date, Business Agent Deady executed the aforementioned ninety-day casual agreement with Cassens. Deady testified that he did so because at the end of August there was an abundance of work on hand at Cassens; far more than all of the employees of the merged companies could have handled, put together. Such an unprecedented increase in volume had occurred that it was clear to Deady that it would not be under control for a long while. Finally, on August 26, Mr. Holsinger left on his business trip for two weeks, and remained inaccessible to plaintiff for more than a month; until he visited the Square Deal office and those who yet remained to close its affairs, on September 30, 1977. He testified that "my schedule did not permit me" to contact them for "several weeks" because he had meetings in Louisville and Kansas City, and several important local meetings thereafter, as well.

By Monday, August 29, 1977, the plaintiffs had learned that yard work was definitely available at Cassens; and some had learned further that a Bid was being or had been conducted to obtain it. The plaintiffs were still working in the Square Deal office until their respective termination dates, which had been scheduled in inverse order of their office seniority; and they could see the three young men working at Cassens, which occupied contiguous premises. The plaintiffs (who had been told no more than had been disclosed at the bar) decided to request a meeting with Cassens President Shashek and a union representative. They called the union hall and were advised by Mr. Deady not only that Holsinger was indefinitely unavailable, but that Deady himself was otherwise engaged and would attend no such meeting. Deady testified that plaintiffs did not mention yardwork during that call, and that if they had, he would have told them their position had no merit. He never told Holsinger of their call, and testified that he never thereafter heard from any of the women again.

The status of plaintiffs' representation after August 26th is another interesting and open question, on this record. Although both defendants stoutly maintain the separateness and distinctness of the office bargaining unit, that "unit" never had its own steward because, according to Holsinger, a Local 299 rule required a unit to include at least fifteen persons, to merit a steward. The Garage unit, however, included fewer than fifteen persons and had never been without a steward, while the office had shared its steward *with the drivers and yardworkers* since 1958, notwithstanding the alleged total disparity of interests of those groups. The office staff included twenty persons, of whom only eight (all of them women) were included in the "unit." Holsinger had been the drivers, yard and office steward until he joined the union staff in 1974; and it is unknown to this record who the steward was for drivers, yard, and office, on August 29, 1977. Whoever that person was, however, it is safe to say that he had moved to Cassens with the drivers and yardmen, and was no longer available to plaintiffs.

Moreover, the women were ignorant of their entitlement to a steward, anyway; although the most senior plaintiff, Frances Jones, had paid union dues since April of 1958. No plaintiff had ever filed a grievance; and several testified to their belief that the union and the contract book existed for the benefit of the drivers only. They had never known who their steward was, if any, and plaintiff Frances Jones had called the Toledo Terminal Local 299 steward, at one point, for reassurance of their continued employment. Over the years, in the face of such disparaties in treatment, the women testified that they had been afraid to complain because they needed their jobs, and Square Deal supervision had frequently reminded them of that fact.

So, in the face of Business Agent Deady's refusal to represent them, plaintiffs called the Square Deal Garage Steward, Glen Karkeet, to come up to the office and represent them in their meeting with Cassens' President Shashek. Karkeet went up to the office immediately, but told plaintiffs he

was "only the garage steward" and without authority in the matter. He, too, asked Deady by telephone to come represent the women, and Deady again advised ". . . that there was no way I would have anything to do with it." When the Cassens President arrived, Karkeet testified that he told Shashek "these women want to know if they have jobs," because it was common knowledge throughout the premises that the women simply wanted jobs. Shashek, however, directed Karkeet back to his duties in the garage, forthwith, and met with the unrepresented women in the presence only of Harold Jones. What was said is, once again, hotly disputed.

The women testified uniformly that, once again, they asked first for office jobs; then to bid into the yard; then for work in any capacity, with or without seniority, or as new applicants. President Shashek, undisputedly, said that Cassens did not employ women in its Terminal; that no jobs were available either in the office or the yard; and that no woman had ever worked in Cassens' yard and none ever would, "and that's final." Mr. Jones stoutly denies plaintiffs' uniform claim that Shashek also stated that no applications were available for new hires, and that none would be accepted or filed for future consideration, as had been Square Deal's longstanding practice. Jones did not deny that each plaintiff tried to describe her qualifications for yardwork, (i.e. ability to change a tire, jump a battery, or change a battery, drive a car, etc.); and did not deny his longstanding prohibition of women in the yard because they might "make trouble." Jones simply insists, as is defendant Cassens' consistent position, that plaintiffs were told they were a "separate and distinct bargaining unit," ineligible to bid by seniority into the yard. Thereafter, he denies that any plaintiff, then or later, ever asked to be hired as a new employee in any capacity or ever asked for an application. Mr. Jones, and defendant Cassens, insist that plaintiffs never sought consideration except as bidders into the yard, with full seniority. Cassens made no mention whatsoever, during trial, of either their lack of computer training or their union membership. In the totality of circumstances presented, defendant Cassens' version of the facts is no more credible than the Local Union's, and this court credits the plaintiffs' uniform and consistent insistence that they requested consideration on every basis conceivable to them at the time, and were rejected.

Plaintiff Jones, the most senior of the women, worked until November 12, 1977, closing out Square Deal's offices; and on that date she filed three grievances. On two of them, regarding unpaid sick and holiday pay, she ultimately prevailed, although no monetary remedy was awarded, she testified, because Square Deal had become nonexistent in the interim. The third grievance protested Cassens' refusal to employ any of the Square Deal women office workers. Local 299 President Lins wrote her, in response, that it would be heard by the same Conference Committee to which Holsinger's grievance had been referred. Lins did not direct the grievance to that panel however, but diverted it to a Michigan Officeworkers' panel instead, which was without authority to grant the expansive relief which a Conference Committee was empowered to afford. Both the Holsinger and the Jones grievances were denied in January of 1978, and there is no indication of record that the union made any presentation on behalf of either grievance.

When Holsinger's allegedly more pressing duties had subsided, on September 30, 1977, he went to visit those few plaintiffs still at the Square Deal office, because he "felt sorry for them, as a personal friend," and to give them a copy of his August 26th grievance. They renewed their plea for union intervention to obtain yardwork, and as a personal friend he again advised them that they could never survive a winter in the yard. Again, he denies that any request for yardwork was made on this or any occasion, and again this court is unable to credit his version of the facts.

■ The credible facts of record here clearly demonstrate that, in competition for

the better jobs historically; and for any jobs at the end, the plaintiff women were the victims of intentionally disparate and less favorable treatment than similarly situated male employees at Square Deal and, finally, at Cassens. Both the union and employer intentionally discriminated against them, albeit for different reasons. Employer management, in the person of Messrs. Jones and Shashek, had a sex-based animus against female workers on the premises. The union pandered to that animus in its zeal to represent male unit members (and even male outside applicants for jobs) at the expense of the women, whom it considered to be no more than an auxiliary to the real bargaining unit, and a source of unobligated dues for twenty years. The union's testimony was consistent that plaintiffs had the more *"pleasurable"* jobs, and were not considered for the better *paid* jobs, or those which afforded overtime and/or less likelihood of layoff. Both defendants have made obvious misrepresentations both to plaintiffs and to this court. The secrecy in which the defendants disposed of plaintiffs' interests adds to the incredibility of their several conflicting and contradictory versions of these events, which are unified only in their obvious mutual determination to stonewall the women. In short, only plaintiffs and the Garage Steward, Karkeet, appear credible in their narrative of events as they saw them.

Accordingly, in evaluating the legitimate business reasons articulated by defendants for their conduct toward plaintiffs the court first notes that a preponderance of the evidence indicates that the excuse, raised by both defendants, that they did not know of the plaintiffs' desires or availability is pretextual. Both defendants knew that the plaintiffs sought jobs, on any terms, and discriminatorily awarded those which were available to males who were, as will be seen, no more qualified than were plaintiffs, and who had no greater entitlement thereto than plaintiffs, as will be seen. Indeed, males with less terminal or company seniority were awarded the jobs on which plaintiffs were not permitted to bid.

The defense next articulated by defendants, that the Joint Arbitration Committee award required plaintiffs' preclusion from the Bid of August 1977, is also pretextual. Cassens' Terminal Manager Jones acknowledged as much, in his testimony. That Arbitral decision requires only that seven employees from Square Deal be taken to Cassens' yard list, and that the new yard seniority list be prepared by "Master", or company seniority. If plaintiffs had been permitted to utilize their company seniority to bid and had not been limited to *classification* seniority as officeworkers and precluded from the bid as well, they all would have won jobs at Cassens and the plain language of the arbitration award would have been fully honored.

The defense next articulated is that the applicable collective bargaining agreements required that plaintiffs be prohibited from participation in the final Bid. That argument is clearly pretextual for invidious discrimination. First and foremost, the Merger Article of the Master Agreement, which is cited in the Arbitration Award itself (Article 5, page 17), provides that "the terminal seniority lists of the two companies should be dovetailed so as to create a Master seniority list or lists *based upon total years of service with either company.* There is no requirement of separation by division or by classification as defendants here argue, except for the Garage, when a merger occurs. Moreover, the nondiscrimination Article of the Master Agreement provides that, in those terminals where classification seniority obtains, terminal seniority shall prevail. (Article 26, pp. 57–58). Finally, the court again notes that only the Garage supplement precludes use of competitive seniority against persons in another "division"; that the Arbitration Committee is contractually authorized to supersede contractual terms and, insofar as those terms may be construed against plaintiffs' bidding rights, it appears to have done so in this case.

The argument that the office, which had been governed by the Master Freight agreement until 1971, had not accumulated

Master Transport contract competitive seniority status, is equally flawed and pretextual. Drivers historically, up until the date of the merger (and presumably today) were compensated either under the Master Transport or Master Freight agreements, depending upon what they hauled and how far, and continued nevertheless to accumulate unbroken Master Transport contract seniority over all the years of their employment.

■ We come next to the argument that consistent historical past practices at the Square Deal workplace had, essentially, constructed *de facto* separate and distinct bargaining units for the garage, drivers, yard, and office, and uniformly prohibited transfers or bidding with seniority from any one "unit" into another. This argument, of course, does not meet the question of why plaintiffs were not permitted to apply as new hires. Defendants nevertheless argue strenuously that uniform past practices have placed a gloss on the contract language which must be honored here, and which is immunized despite any discriminatory impact, under § 703(h) of the Title VII, 42 U.S.C. § 2000e–2(h).

If such a *de facto* system were indeed established, this court must measure its *bona fides* and immunity in accordance with the standards applied to *de jure* systems: and these standards were recently examined by the Sixth Circuit Court of Appeals in *EEOC v. Ball Corporation*, 661 F.2d 531 (1981). That court wrote that, to qualify for § 703(h) protection, the system must operate to "discourage all employees equally from transferring between seniority units," and the policies in question must have been "negotiated and maintained free from any illegal purpose," citing *James v. Stockham Valves & Fitting Co.*, 559 F.2d 310, 352 (5th Cir. 1977) cert. denied 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). The system on which defendants rely herein, whether *de facto* or considered as *de jure* by adoption of their interpretation of their contracts, cannot qualify as *bona fide* under that standard. It does not operate uniformly, except against women, and it

has not been maintained (if negotiated) free from unlawfully discriminatory purpose.

Defendant Local 299 and Square Deal had, by August of 1977, completely undermined the integrity of all applicable seniority provisions by their practices: which were to provide complete freedom of movement and opportunity as to contract supplement applicability, for all employees except the women who were placed in the "office bargaining unit" and not permitted to move out. As mentioned above, no seniority list was posted anywhere, despite the uniform requirement in every supplement of posting. Moreover, *no company or terminal seniority lists existed*: only classification lists, and a garage division list, were ever prepared or utilized. That practice was in patent violation of the nondiscrimination article of the Master Freight Agreement, which required that terminal seniority prevail over classification. The classification seniority lists, moreover, did not reflect the true location or duties of the persons listed thereon. Only plaintiffs were limited to the opportunities available within their classification.

In 1958, the merged Driver-Yard list was created because according to Wilson Holsinger, "we wanted to maintain that yard work for our Truckaway Drivers." The record indicates clearly that this local union's overweening desire and purpose, in creation of its *de facto* "systems", and maintenance of "divisions" was to provide the best available job opportunities, regardless of "units", for the all-male drivers, and their male progeny, as described elsewhere in this opinion. Any job assignment or "bargaining unit" on the premises was available to drivers who could not drive for lack of work, lack of equipment, ill health, old age, or failure to meet regulatory qualifications.

Moreover, the seniority list or "unit" in which an employee was listed, as frequently as not, bore no rational relation to the duties in which that employee was engaged, or the community of interest which he or she shared. The women were simply assigned to the office bargaining unit, while

the men were free to pursue opportunities between and among all areas of the establishment, frequently with no alteration of their formal designations whatsoever. The men retained their formal designations on the most advantageous list available when working elsewhere, or even when their regular jobs would have been more appropriately included in the "office unit" if that unit were not in actuality the women's unit. The women's unit, finally, was the most disadvantaged in every respect. It did not even pretend to include all office personnel, but only the eight females among 20 office workers. Other male clericals throughout the terminal were carried routinely on other seniority lists, as well. There were no incentives to move into this unit, but many to move out; and the women, despite innumerable requests, were never given that opportunity.

In examining defendants' "separate units" argument the Garage unit should be considered first because since 1955, nationally, the garage division/list has been contractually isolated. Article 80 of the National Master Transport agreement flatly prohibits bumping into and out of the Garage division: and defendant union's administration of and past practice under that Article give considerable insight upon the *bona fides* of its claim concerning its *de facto* isolation of the office, by past practice. The record reveals that the Local has not honored the prohibition against bumping into or out of the Garage; although that is the *only contractual prohibition* against such bumping in any contract or supplement presented herein. That provision was treated, historically, as a mere formality.

The *highest paid* clerical employee in the Square Deal Terminal (a male) was employed in the Garage Division as a "parts clerk." His work flow was direct to the office accounting department. When plaintiff Ruane was assigned to work in the Garage, however, as a cost-analysis clerk for heavy equipment, she too reported directly to the accounting department: but she was paid at a lower rate and kept on the office "unit" seniority list. The Garage

division was also utilized, informally, as a temporary assignment for drivers idled by truck breakdowns, health problems, or lack of work. Both defendants readily admit that Drivers under such circumstances would be paid hourly, under Garage supplement rates, and "work extra" in the Garage unit until times got better. Holsinger named four drivers, who were worked "extra" in the garage, rather than laid off. Indeed, Holsinger testified that a "recognized exception to the rule against crossovers" was lack of work. That exception has never been made for any woman, however, and only women employees comprised the office unit. Women did not constitute all office or all clerical workers; and no woman ever worked on the garage, yard, or drivers list at either Square Deal or Cassens.

As noted above, the industry practice of maintaining separate driver and yardman lists was abolished at Square Deal in 1958, to provide continued status for nondriving "drivers." The consolidation of those separate and distinct communities of interest again belies the *bona fides* of defendants' claims of the integrity of its seniority system and the inevitability of its operation against plaintiffs in this instance. Indeed, the Yard unit shares far greater community with the office unit than it does with drivers. Yet the classification list of drivers was merged with the yard to provide them exactly the opportunity which was denied to plaintiffs herein not only in 1977, but on numerous occasions in the years prior. The yard and office were both paid at hourly rates; were both bound to the terminal; both reported to the chief dispatcher; were both concerned with load makeup; and both shared more similar benefit packages than did the drivers, who were paid by mileage, under the Truckaway contract, and performed their duties on the road. Nevertheless, Local 299 had no difficulty, whenever necessary, in paying a driver assigned to the yard pursuant to the yard supplement, and permitted the accrual of seniority in both classifications, while precluding the women's "unit" from yard entry

altogether. It is notable also that three clerical "yard inspectors" were employed at Square Deal from 1975 to 1977 (all male: as temporary employees) and that those three young men transferred to Cassens to work in that same classification. Plaintiff Harder had performed the yard inspector duty on rare occasions (rare because of the potential of "trouble") and the incumbents generated data which plaintiff Nickels then formalized in the office, for the processing of claims. The inspectors were never included in the office "unit," and plaintiffs (despite requests) were never permitted to claim those jobs. Aside from the distinctiveness of the office unit, Terminal Manager Jones suggested in his testimony that plaintiffs might lack the special qualification required to perform the yard inspector job: the ability to identify damage on an automobile.

Both Holsinger for the union, and Harold Jones for Cassens, strenuously attempted to justify the merger of driver and yardman classifications and the isolation of the office, with testimony that every yardman was required to have federal certification as a truckaway driver, auto haul experience, and a chauffeur's license: and that no person was permitted to work in the yard who was physically unfit to drive, or unable to meet federal regulatory physical standards. Both witnesses later conceded the falsity of that testimony. Square Deal hired persons into the yard with no prerequisites whatsoever, not even a driver's license. Holsinger conceded that he had trained the sons of several drivers who were hired into the yard with no skills at all, made truckaway drivers of them, and that they thereafter bid for routes as drivers, annually, as everyone on the yard-driver list could do. Holsinger could train a yardman to drive in two weeks, to load cars onto a trailer in another two weeks, and considered him a fully capable truckaway driver after a year of occasional assistance. He gave this training to the sons of drivers Rowland, Holland, Boone, Woodard, and others. Testing for the federal certification was then conducted internally, as well. If the yardman did not wish to drive routes, he was free to remain unqualified and remain in the yard.

Among those who remained in the yard were also those drivers who had bid for and won an annual route, but who were not driving it for lack of shipments, or because their truck was broken, or because they had become too sick or old to drive, or because they could not pass the federal physical examination. The yard furnished a place to work until one could drive again, or could retire. Holsinger himself acknowledged that, as a driver, he worked the yard and the garage after surgery rendered him too weak to drive: and that when he felt too weak and cold for any of the above, he sat in the dispatcher's office. The court credits plaintiffs' testimony that he was permitted to work in the office as well, as were others who remained on other seniority lists.

The office "unit" included all women clericals, even if located in the garage, as plaintiff Ruane was as a garage costs-analysis clerk. The office unit did not, however, include the male garage parts clerk; or the male yard inspector clericals; or the dispatchers (all male, of whom there were three full-time and two part-time, located in the office); or the men who worked "in claims"; or the all-male assistants to the all-male supervisory staff; or the male payables clerk, Whitman, although it did include the female receivables clerk, Mazey.

The office unit was one into which no one requested entry, from 1955 to 1977, although it was utilized for temporary refuge from layoff for persons on other seniority lists, at will. There were *many* requests from plaintiffs to leave this disfavored unit through those years, however: and not one was ever granted, even when the alternatives were short workweeks, layoffs, and ultimately discharge.

The members of the office unit had the status of the lowest-paid union-represented people in the entire car-haul industry. Frances Jones, the most senior plaintiff, left Square Deal at an annual compensation of approximately $17,000.00 in 1977. She worked on payrolls and was aware of yard-

men who earned between $25,000 and $30,-000. Their hourly rate was $0.50 higher than the office, and they had the opportunity to work substantial overtime.

Defendants herein make much of the fact that the contract supplement applicable to the office seniority list included a guarantee of at least 40-hours work per week, and that plaintiffs were protected from layoffs in other classification lists by their standing on a separate office list.

The value of those "protections" was demonstrated in 1974, however, when both defendants acknowledge that Local 299 waived the 40-hour guarantee for the office and plaintiffs all worked three days weekly, although the work week was never reduced in the yard, and no layoffs occurred in the yard, either. Holsinger admitted, also, that plaintiffs had enjoyed no advantage whatsoever insofar as layoffs were concerned, in the office unit; and that a driver or yardman could be laid off for several months of any given year and still earn more than any woman in the office unit. Also, it must be reiterated, it is undisputed that the Local and Square Deal made work available in other units (including the office) for any male employee who might otherwise be laid off. The converse was never available for any member of the all-female office unit.

The layoff experience of all but the most recently hired plaintiffs was an unfortunate one. Undisputedly, in the early 1970's many of the women were laidoff when no one else was, at all. Plaintiff Harder was hired in 1965 and laidoff for one year from 1967 through 1968, for two months in 1971, and for six months in 1973 and 1974. In response to her many requests for work in the yard, and her expressed concerns about the support of her eight children, Local 299's Holsinger told her that she was "too emotional" about layoffs, and worried too much. He told her to be glad that she always had a good job, "the most pleasurable job" at Square Deal to come back to; and he advised her "as a personal friend" not to press her requests for yard work.

Plaintiff Ruane was hired in 1969, laidoff for four months at Christmas in 1970, and for six months in 1974–1975. When Square Deal's (and later Cassens') Mr. Levinson recalled her in 1975 she had found a job with the City of Fraser, and bought a house. She asked Levinson if this was a permanent recall, because she had heavy responsibilities. Mr. Levinson told her she could count on him and not to worry: so she left the new job to return to Square Deal.

Plaintiff Nickels was hired in June 1973, laidoff for two years, and was recalled in 1975, at which time she left a new job because she would be represented by a union at Square Deal.

All of the plaintiffs herein asked both defendants more than once prior to August of 1977, for either driving or yardwork or both, and all were rejected. Defendants have stipulated that defendant Cassens had received applications from women to drive prior to the merger, as well, but never tested one.

At Square Deal, plaintiff Frances Jones had been aware that women were drivers during World War II, but none since. She repeatedly asked to drive, over the years, because of the high income earned thereby. She asked Square Deal supervisors Bigger, Boari, Schultz, Jones and Levinson, as well as the union's agents. Every response was negative, and every response referred to her sex. Plaintiffs Nickel, Ruane and Harder all testified that they asked for driving and/or yardwork and were laughed off; were told that they could not tie down cars or load a truck, could not bear the cold; or otherwise could not be seriously considered, basically because of presumptions applied to their sex.

Inasmuch as defendants appear to have articulated, ever so tentatively, some question as to whether the plaintiffs were *qualified* for any work other than the office jobs which they undisputedly did perform, their demonstrated capabilities and responsibilities must be examined.

All of the plaintiffs operated a variety of office machines. Plaintiff Jones prepared the Square Deal payrolls, *inter alia*, from

1955 through 1977. Others did billings and prepared damage claim reports on the basis of the jottings of the higher paid yard inspectors. As garage costs clerk, plaintiff Ruane had calculated and recorded the cost of operating each truck; and was responsible at another period for dispatching of sunroofed cars from Lansing to dealers along the routes of the drivers. That task required coordination of the drivers, the sunroof plant, the routes and the loads, all to minimize costs and by telephonic directives. Ms. Ruane was also responsible, at another period, for ascertaining and reporting to the Chrysler Corporation on the status and whereabouts of Chrysler automobiles listed on computer printouts for inquiry, called "delay tapes." At the dispatch window, various plaintiffs were made responsible for pulling the keys needed for each truckload of cars, and metering gasoline to drivers.

Nevertheless defendants suggest, albeit tenuously, that none of the plaintiffs were qualified to perform any work other than that which was taken from them. The vagueness of defendants' "qualifications" suggestions may be due to the fact that they never tested plaintiffs' qualifications for any job on the premises of either Square Deal or Cassens, or gave them the opportunity to perform any job which they could not do. But further, the extremely minimal "qualifications" which the male incumbents have brought to those jobs, with apparent success, are so very glaring that it ill-behooves them to raise the subject at all.

Mr. Harold J. Jones himself, the present Cassens Terminal Manager, appears to be the chief beneficiary of both defendants' years of invidious discrimination and is, accordingly, its stoutest defender. Mr. Jones arrived at Square Deal in 1948 with unknown credentials, as a part-time weekend watchman. In 1949 he became a full-time clerical, in 1953 claims manager, and so forth, until 1973, when he became President of Square Deal until 1977, at which time he became Terminal Manager of Cassens. He was never a member of the "office unit": and he never permitted a woman to work in the yard, as a driver, or in any position of recognized responsibility or authority at either Square Deal or Cassens at any time known to this record.

When asked of the qualifications he required for the Dispatcher job, Mr. Jones advised this court that the job was at the core of Terminal operations and required a man of independent judgment, a man capable of complex decision making, a man capable of handling money, a man capable of reprimanding a driver, etc. The court notes further that the job has been successfully filled by a series of former security guards and watchmen. No tests are given. No educational or experience requirement existed and no objective challenge has been raised to the claim of several plaintiffs that they can do the job: except for the stated requirement that the incumbent be a man.

As to the yard and driver jobs, defendants suggest not only enormous intellectual requirements, but that the physical demands of those jobs are so great as to be beyond the capacity of any female. Again, it is noted that plaintiffs' capacity to perform those jobs was never tested, despite innumerable requests therefor. It is also noted that defendants have never suggested *which* of the innumerable qualifications they list for these jobs (for the first time) the plaintiffs might fail to meet. The court, however, will accept without listing here the extraordinary catalogue of feats which defendants argue must be performed in the yard, and as a driver. That well may be. However, one learns from this record that one cannot be too weak, too sick, too old and infirm, or too ignorant to perform those jobs, *so long as one is a man.* The plaintiffs appear to the layperson's eye to be far more physically fit than many of the drivers who moved into the yard, over the years, according to the testimony of defense witnesses. Plaintiff Harder pumped gas and cleaned a gas station among other jobs, when Square Deal closed. Plaintiff Murray had been a wartime riveter of airplane doors, which she lifted in the course of that job, plaintiff Ruane (like all the others) could drive, change tires, and change batteries. In short, they were all at least as fit

as the men with serious physical deficits and disabilities who held yard jobs. As to the intellectual qualifications, none beyond the ability to read and write existed, except for the jobs which plaintiffs held in the office. Plaintiffs were, on this record, as qualified as any male who obtained any position at either Square Deal or Cassens which they were denied.

Plaintiffs sought jobs at Cassens not only on the basis of their Square Deal seniority but as new hires, and were discriminatorily rejected on that level, as well. After plaintiffs were terminated at Square Deal on August 26, and were rejected as new hires by Cassens President Shashek on August 29, 1977, and after absorbing all of Square Deal's male bidders, Cassens hired new male employees of no greater qualifications in substantial number, both into the office and the yard. The conduct of both defendants in proceeding to effectuate brand new hires as they rejected plaintiffs pleas was clearly intentional, disparate and discriminatory treatment.

The Arbitration Award and the Bid of August 1977 obviously contemplated the existence of a total of seventeen jobs in Cassens' yard. But by September 29, 1977, Cassens had 21 men listed on its yard seniority list. Four of those had been hired aside from the bidders on September 2, 1977, and were totally new employees. Also, on August 26th the defendant Local Union had executed the casual agreement permitting the three young male "yard inspectors" to work without seniority listing for 90 days. So 24 persons worked in the Cassens' yard from September 2nd until November when the three casuals were hired into permanent status in the office. Two other male office clericals were newly hired into the office during October.

Defense witnesses testified uniformly that the upsurge in the autohaul business of fall, 1977 was the greatest ever known to their experience, and did indeed require an immediate and substantial number of new hires at the Cassens Terminal, in all divisions. The discriminatory nature of their rejection of plaintiffs, under all of the above facts and circumstances, is overwhelmingly apparent.

After their terminations, none of the plaintiffs sought jobs as yardmen or truckdrivers elsewhere. Defendants argue that this fact indicates either that plaintiffs alleged requests for those jobs at Square Deal and Cassens are false; or that plaintiffs did not attempt to mitigate their damages. This court cannot agree. These women were not at prime job-seeking age when defendants placed them among the unemployed. Several were within five years of full Teamsters pension eligibility at Square Deal. They clearly made diligent searches for work which was within their relevant past work experience, in which they had a demonstrated competence, and for which they were entitled to expect good references. They would have done *any work available* at the Cassens Terminal, however, for the privilege of finishing out their careers in the same job community. They cannot be required now to have attempted to launch new careers as drivers or yardmen; jobs for which they could present no experience, and no reference, and for which the new employer would be expected to train them for the few years of service they could offer before retirement. Plaintiffs have made it abundantly clear that they did not stand on their dignity and demand "pleasurable" work, as defendants still appear to accept. They conducted job searches which were reasonable under the circumstances presented, with all due diligence.

Plaintiff Murray, who would have earned a full pension in three more years but for defendants' discriminatory conduct eventually settled for a partial early pension. Plaintiff Frances Jones did the same in March, 1978, after over 20 years of service to Square Deal. Both continue to work. Plaintiff Ruane, who was rendered unprotected by health or hospitalization insurance by defendants' actions, suddenly required brain surgery and was unable to work from January 29, 1980 through August of 1980. The employment she had found did not provide the benefits which the Teamsters

contract had provided, and her parents were compelled to pay the costs of her illness.

Plaintiffs have, in short, suffered serious losses—not all of which are compensable by a subsequent monetary award—because of these defendants' unlawful conduct. In future hearings on the bifurcated remedy phase of this lawsuit, however, this court will attempt to address this problem.

On this record it is clear, however, that defendants treated plaintiff disparately and less favorably than similarly situated males, and that defendants' conduct constituted intentional invidious sex based discrimination, under all of the well-settled law cited above. Plaintiffs were never even fairly afforded the protection which their contractual seniority systems afforded them. The union's conduct was not only intentionally discriminatory but also constituted a clear breach of its duty to represent the women fairly as members of the Square Deal collective bargaining unit.

On the basis of the above-outlined findings of fact and conclusions of law, a judgment of liability to plaintiffs shall be and hereby is entered against both defendants herein.

IT IS SO ORDERED.